468 So.2d 1154 (1985)
STATE of Louisiana
v.
Peggy LILLY.
No. 84-K-2167.
Supreme Court of Louisiana.
May 14, 1985.
*1155 Robert J. Roux, Lake Charles, Alton T. Moran, New Orleans, for defendant-applicant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Byran Bush, Dist. Atty., Kay Kirkpatrick, Asst. Dist. Atty., for plaintiff-respondent.
BLANCHE, Justice.
Peggy Lilly was indicted and charged with the negligent homicide of her eight day old son, a violation of La.R.S. 14:32. She pled not guilty, waived trial by jury, and was found guilty as charged by the trial judge and sentenced to serve five years with the Department of Corrections, the maximum sentence provided for the offense.
The First Circuit Court of Appeal affirmed the conviction. 459 So.2d 1313 (1984). We granted writs to review the sufficiency of the evidence resulting in her conviction. 463 So.2d 595 (1985).
A detailed examination of the evidence is as follows:
The child was delivered by an ambulance driver on August 7, 1980, on the way to the Earl K. Long Hospital in Baton Rouge, Louisiana. The mother, who had received no pre-natal care, and the baby were both discharged from the hospital on August 9, 1980, purportedly in good physical condition. However, the child's medical records indicate that the baby's fever was anywhere from normal to 100° during his three day stay in the hospital.
The infant had been at home, in defendant's care, for five days immediately preceding his death. An autopsy indicated that the cause of death was pneumococcal meningitis with a secondary diagnosis being pneumococcal pneumonia. The autopsy also revealed that there were abrased areas on the face and right wrist and multiple areas of hemorrhaging beneath the scalp. The grand jury's true bill was returned based on the mother's failure to obtain medical treatment for the child.
The mother of defendant's "common-law" husband, James Jones, stayed with defendant after her dismissal from the hospital. On the morning of the child's death, she asked her daughter, Avis Hutchinson, who was a nurse's aid and had worked for ten and one-half years in the neonatal intensive care nursery at Earl K. Long Hospital, to come and examine the child. On arrival, she found the child laying across defendant's lap. Defendant would not permit Ms. Hutchinson to get near her to examine the child or use the telephone to call for help. Finally, Ms. Hutchinson went to a neighbor's house to call the fire department for emergency assistance.
Kenneth Mizell of the Baton Rouge Fire Department arrived at defendant's residence in response to the call and observed the emergency medical technician trying to get the baby away from defendant with defendant protesting that there was nothing wrong with her child. He testified that there was nothing that could be done for the child, but the mother would not give him up, evidently not aware that the infant had expired. Finally, mother and baby *1156 were transported to the hospital by the medical technician.
Lonnie Callahan of the East Baton Rouge Sheriff's Office also saw the baby that morning. According to him, the baby did not look right and was not moving.
None of these witnesses had seen the child before his death. However, two members of defendant's family did testify regarding the child's condition during his five days at home.
James Scott Lilly, age 7 at the time of his brother's death, testified to playing with the baby, changing his diaper, feeding him a bottle, hearing him cry "quite a lot" and seeing the baby vomit a couple of times. His opportunity to observe the child was limited as he was not at home during the eight day period for more than a day and a night.
James S. Jones, defendant's "common-law" husband and the child's natural father, was the other family member to testify. He stated that he worked twelve hours a night, seven days a week. He saw the baby every day and had last seen the baby about four o'clock the evening before he died. At that time, he testified that the child seemed fine. During the five days prior to the baby's death, he bottle fed the child and observed the mother holding and feeding the child. He did not recall ever seeing the child vomit. On the day that the child died, Jones stated that the child was crying a lot, but stopped after he stuck a bottle in the infant's mouth. He also testified that the baby was scheduled to go to the doctor for a ten day checkup, which was two days after he died. He recalled that the baby was a little warm but did not regard that as unusual. When questioned by the court, Jones remarked that the baby "took food alright", that he never noticed any high fever and never noticed any vomiting or bulging of the baby's soft spot on top of his head.
The State's case and the trial court's reasons for judgment rested primarily on the testimony of Dr. James A. Freeman, the pathologist who assisted in the autopsy. According to Dr. Freeman, pneumococcal meningitis would be manifested "generally" by high fever, lack of appetite, "usually" a stiff neck and extremities, and projectile vomiting. As this form of meningitis was due to an infection around the covering of the brain, he explained that this type of vomiting was caused by pressure inside the skull. In the newborn, the soft bones and openings (fontanelles) in the skull could serve as a pressure valve, thus causing the head to bulge. Meningitis, he explained, is caused by germs which are usually found in the throat and invade the body when resistance is low. According to the doctor, a baby with high fever would show such signs as crying, being cross or erratic and sleeping abnormally long. He had not seen the baby prior to the autopsy.
As a result of the autopsy, Dr. Freeman stated that the child weighed 8 pounds two ounces at birth and seven and one-half pounds at death. This ten percent weight loss was characterized by him as unusual since normal babies gain 20% of their weight in the first week. Examination of the three marks on the baby revealed that the skin was off each spot and that the one on the wrist was possibly infected. They were diagnosed as being more than a day old. The doctor was unable to state exactly how they were caused but believed them to be a result of either a burn or an abrasion. The scrotum area had a purplish discoloration from more blood settling there than usual. He opined that this was caused by either a post mortem change or a bruise.
When questioned as to the reasonableness of a layman recognizing the symptoms of an eight day old baby with pneumonia or pneumococcal meningitis, he responded that it usually takes a matter of days to get as much pneumonia and infection over the brain as described in the autopsy. He hoped that even a layman would detect at least some change, enough to seek medical attention. The incubation process was fairly rapid, the pathological process "generally" took a matter of days and the germ could have been contracted in the hospital. Dr. Freeman did admit that *1157 in the hands of different people there would be different degrees of recognition of the disease or its symptoms and that the smaller and younger the neonate, the more difficult the symptoms would be to detect. The major signs were fever and for the child to stop eating. The doctor testified that it was not unusual for parents to want to treat the child themselves. He had also seen parents not bring in their child with fever as high as 106°.
At the close of the State's case, defense counsel moved for a directed verdict of acquittal. He argued that the only people who saw the child before his death testified that he did not have the symptoms which Dr. Freeman said accompanied pneumococcal meningitis. Counsel stressed that there had been insufficient evidence presented by the State to show if and when any of these symptoms had manifested themselves to the degree that the mother's failure to take the child to the doctor amounted to criminal negligence.
The trial judge basically concluded that the father's testimony was incredible and rejected as worthless the testimony of the 11 year old son. He stated that the most convincing testimony was that of Dr. Freeman who had examined the child's expired body. He recounted the symptoms which Dr. Freeman stated "would have manifested themselves" and opined his belief that these symptoms "had to have occurred" several days prior to the child's death. The judge was convinced that the symptoms were present and that the defendant's failure to observe them and react to them by obtaining medical care was the cause of the death of the child.
In affirming defendant's conviction against the allegation of insufficient evidence, the court of appeal relied on the assessment of the medical testimony by the trial judge who dismissed as unreasonable the hypothesis that no significant symptoms were manifested by the newborn child prior to its death or that defendant's failure to seek medical care did not constitute gross negligence. We disagree.
This Court's jurisdiction in criminal matters extends only to questions of law, and thus where a defendant has moved for a judgment of acquittal in trial before a judge alone, or for a new trial based upon the contention that the evidence viewed in a light most favorable to the State does not reasonably permit a finding of guilty, a question of law is presented which the Supreme Court can review. State v. Hudson, 373 So.2d 1294 (La.1979); State v. Russell, 352 So.2d 1289 (La.1977); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This procedural requirement having been complied with by the defendant, we move on to examine the law in light of the evidence observed hereinabove.
In the case of State v. Graham, 422 So.2d 123, 129 (La.1982) and State v. Johnson, 438 So.2d 1091 (La.1983), we had occasion to consider the constitutional and statutory standards by which the sufficiency of evidence is to be judged in this state. We observed that:
The Due Process Clause of the Fourteenth Amendment requires this court to review the evidence upon which a criminal conviction is based to determine whether it is minimally sufficient. A defendant has not been afforded due process, and his conviction cannot stand, unless, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Additionally, we are governed by our statutory rule as to circumstantial evidence: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. R.S. 15:438. State v. Graham, supra.

The defendant contends that the evidence is constitutionally insufficient to support her conviction because the evidence concerning her criminal negligence did not exclude *1158 every reasonable hypothesis of innocence.
Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue; whereas, circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Austin, 399 So.2d 158 (La.1981). Where there is direct evidence, the trier of fact weighs the credibility of evidence and the reviewer under Jackson defers to that trier of fact, assuming the proven facts most favorable to the State. Where an essential element of the crime is not proven by direct evidence, La. R.S. 15:438 applies. That rule restrains the fact finder, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. State v. Shapiro, 431 So.2d 372 (La.1983) (on rehearing).
In State v. Chism, 436 So.2d 464, 470 (La.1983), we integrated the two rules saying: "Although the circumstantial evidence rule may not establish a stricter standard of review than the more general reasonable jurors reasonable doubt formula, it emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence."
It is therefore incumbent upon us to decide what reasonable inferences may be drawn from the circumstantial evidence and to determine whether they exclude all reasonable hypotheses, not every possible, theory of innocence. State v. Austin, supra; State v. Johnson, supra; State v. Jackson, 419 So.2d 837 (La.1982); State v. Graham, supra; State v. Shapiro, supra.
La.R.S. 14:32 defines negligent homicide as the killing of a human being by criminal negligence. La.R.S. 14:12 states that criminal negligence exists when although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
The burden of proof was on the State to show from the evidence beyond a reasonable doubt that the baby exhibited symptoms of pneumococcal meningitis (or such severe symptoms of illness) that the defendant noticed or should have noticed these symptoms, that she failed to obtain medical care for her baby and that this failure was the cause of the child's death.
There is no credible direct evidence from anyone as to what symptoms, if any, the child exhibited because the trial judge rejected the testimony of the defendant's young son, Scott, and that of her husband. Their testimony reveals that both fed the baby, and that Scott changed his diaper. The father did not notice the child as having high fever and he saw him every day. There is no evidence of projectile vomiting or enlargement of the fontanelles. The judge as the trier of fact weighs the credibility of the witnesses and we defer to his judgment as to this direct evidence.
We must now examine the circumstantial evidence. The testimony of Avis Hutchinson and Fireman Mizell described the defendant as a person in shock, protesting that nothing was wrong with the baby, refusing to let Ms. Hutchinson examine the child and refusing to give up her son to the medical technician who finally drove both mother and child to the hospital. Concerning the defendant's awareness for medical assistance, she received no prenatal care and delivered her baby in the ambulance on the way to the hospital.
The testimony of Dr. Freeman, detailed hereinabove, is a hornbook recitation of the usual symptoms exhibited by one with pneumococcal meningitis. These are almost the identical symptoms prevalent with the more deadly meningococcal meningitis which kills most of its child victims within a few hours. With regard to the difficulty in recognizing meningitis in a neonate, the doctor responded, "I would assume in the hands of different people, there would be a different degree of recognition." With regard *1159 to an eight-day-old baby, he conceded: "The smaller the infant and the younger the infant, the more difficult it would be for somebody else to determine that he is in fact ill, especially, a layman." In response to the fever symptom, he testified that he would not consider it unusual for parents whose child had fever even as high as 106° not to bring the child to the doctor, but to treat the child at home. When asked by the trial judge to summarize symptoms which would be recognizable by a layman, Dr. Freeman stated that he would "suspect" that an early symptom would be the child not eating and then a fever would be noticeable. He characterized projectile vomiting as a "significant" symptom which "usually" occurs. The judge, framing his appreciation of the doctor's testimony, asked:
Q. Okay. So, the only thing that you can say in this particular case is that, probably, again, speaking in generalities, probably, at least some of these symptoms existed for several days before the death?
A. Yes, sir.
Considering the age of the infant, Dr. Freeman was unable to testify when and if any, or all, of the symptoms would necessarily occur. Nor did he give any indication of the statistical frequency with which such symptoms might be manifested. The doctor, although an acknowledged authority in his field, could only use words describing the symptoms as "usually", "generally", and "most commonly".
Thus we conclude that the State did not exclude the reasonable hypothesis that the symptoms did not manifest themselves to the degree, and at a time, which would cause a rational trier of fact to conclude that the mother's failure to summon medical care amounted to criminal negligence.

DECREE
Therefore, for the foregoing reasons, the defendant's conviction and sentence are reversed.
REVERSED.
DIXON, C.J., and LEMMON, J., concur.