784 So.2d 464 (2001)
Linda B. BROWN, Appellant,
v.
Horace Epps BROWN, Appellee.
No. 5D00-696.
District Court of Appeal of Florida, Fifth District.
March 9, 2001.
Rehearing Denied April 10, 2001.
*465 John W. Foster, Sr., Robert W. Thielhelm, Jr., and Eric S. Golden, of Baker & Hostetler, LLP, Orlando, for Appellant.
Michael R. Walsh, Orlando, for Appellee.
PER CURIAM.
Linda Brown ["wife"] appeals certain financial rulings in the final judgment dissolving her marriage to Horace Epps Brown. We affirm in part and reverse in part.
The parties met in Florida in 1977 while wife was attending college in Canada, studying physical education and art. Husband asked her to return to Florida to help him ranch and farm on his father's ["Oren Brown"] land. After moving to Florida, wife worked in a gift shop, husband worked in his father's pool hall and both worked at ranching.
They lived in a trailer on part of the father's many acres of land and were married on October 6, 1979. They have six children, four of whom are minors: two boys, aged fourteen and eleven, who have significant learning disabilities, and two six-year-old twin girls.
By 1980 husband and wife became more involved in ranching. They did a wide range of things to make money, such as planting watermelons and cutting cypress knees to sell in the gift shop. After their second child was born in 1981, wife began taking lessons to learn how to paint on china and began earning money painting porcelain tiles.
Their trailer burned down and the parties moved into wife's art "studio," which had been built with funds earned by wife and money provided by Oren Brown. They had two children at the time as well as husband's daughter from a previous *466 marriage. All five resided for several years in the kitchenless one-room studio.
When wife was pregnant with her third child, husband decided that they needed a better marital home so he went to his father. Oren Brown executed a deed in his son's name alone for a fifty-four acre parcel of land where the trailer and studio were already situated. Husband did not tell wife that her name was not on the deed. When wife found out, she asked her husband why her name was not on the deed. She testified he said that was the way his father did things and to not worry because it was half her land. Husband testified he only said she would get the land if he died or that she would have an interest in it if they remained married.
Husband told wife that they could build a marital home if she earned the first five thousand dollars towards the construction. Wife took a painting job at the Maison-Jardin restaurant and earned this sum. The balance of the funds to complete the house came partly from Oren Brown and partly from ranching operations conducted on the land.
After wife gave birth to the third child, six people lived in the one-room studio. Wife testified that after this third child, she no longer had time to paint. Construction of the house took two years to complete, with part of the construction performed by the parties themselves. During this period of time, wife did manual labor on the ranch in addition to work on the house. They moved into the new house in 1988, after the fourth child was born. The cost of the house was approximately $80,000.
In 1990, Oren Brown was approached about leasing land for auctions. He was not interested but told husband and wife that they should put it on their property. Husband and wife negotiated an agreement for a three-year lease. A concession stand for the auction has been operated by wife since 1994, and the money generated from the stand was used for the family's living expenses. Under the present lease, husband receives $50,000 a year plus 2.5% commission of any auction sales.
In December 1992, the father deeded another seventy-two acres, contiguous to the fifty-four acre parcel, to husband alone. Wife testified that when she asked why her name was not on the deed, husband responded that was the way his father did things but the property was half hers.[1]
Oren Brown died in March 1993[2] and husband inherited 3,500 acres of property, known as the Poinciana tract. Husband was appointed personal representative of the estate. Because of the new tax liabilities on the inherited property, husband contacted wife's brother, Jeff Ballantine ["Ballantine"], a student at the University of Florida, to ask for assistance. Husband and wife started to formulate ideas to generate revenue. The issue was whether to sell a small portion of developable land or a large portion of wetlands. There were also discussions about rezoning the property for development. During this period of time, they were gaining knowledge regarding how best to develop the property and all attended meetings with developers or city officials regarding development. Wife and her brother attended a land mitigation banking seminar.
*467 Husband sold 1,500 acres of the wetlands out of the Poinciana tract in October 1996. He received $2,360,000 for the sale of this land with net cash proceeds of $1,859,000. The majority of this money was used to pay the estate taxes. The balance of the money from this sale was used to purchase an eighty-eight-acre orange grove in husband's name alone for $440,000. At trial, Walter Carpenter, a real estate appraiser, testified that the 1,800 remaining inherited acres west of Poinciana Boulevard have a value of $14,400,000, and the land east of Poinciana Boulevard is worth $4,750,000.
During a Christmas party in December 1997, wife caught husband in a restroom with another woman. Husband maintains that the other woman pulled him into the bathroom and that he was very drunk. They separated a few weeks after this event. They decided to reconcile shortly after, on condition that husband see a counselor, but they attended counseling only once.
By the end of 1997, wife determined that the marriage was irretrievably broken and filed for dissolution of the marriage. Meanwhile, sale of another thirty-four acres of the wetlands (referred to as the "necktie" piece) to Florida Mitigation Bank was in the works. This land was the buffer between the 1,500 acres previously sold and the land the family lived on. The purchase price was $275,000, including a purchase money mortgage in the amount of $200,000, which pays husband $50,000, plus six percent interest until 2002. Around this time, husband informed wife and her brother that he had decided against developing his land, rather he intended it be preserved as it had been for the last three generations. It is apparent from this record that a large part of the strain on this marriage was that after nineteen years of hard work and struggle husband refused to use his inheritance to improve their living circumstances and wife was powerless to do anything about it.
It was the judgment of the trial court that wife should receive no alimony and no interest in the inherited lands. The trial court awarded wife relocation expenses and attorney's fees/costs. It equitably distributed to her one-half of the auction lease and the concession stand money. It awarded a marital share in a five-acre "homestead" and the thirty-four-acre necktie piece. It also distributed to her an interest in livestock and other miscellaneous assets totaling $14,521. Wife is the primary residential parent. She was awarded child support of $2,359.35, which the court commented would represent a "profit" to her.
We find no error in the lower court's ruling that wife has no marital claim on the inherited lands. The lower court found as fact that husband did not intend or make a present gift of one-half, or any lesser amount, to wife. The court also found there was no increase in the value of the inherited land through marital efforts, and there is evidence in the record to support these rulings.
More troublesome, but not vulnerable to reversal under the highly deferential standard of Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980), is the lower court's ruling that wife had no entitlement to alimony because the standard of living provided by husband during the marriage was so low. The trial court found an after tax need of $4,000 per month, which the court said was met with the income provided by equitably distributed assets and by imputing $2,000 a month income to wife.
The standard of review of a trial court's imputation of income is whether competent substantial evidence supports the findings. See Hinton v. Smith, 725 *468 So.2d 1154, 1156-57 (Fla. 2d DCA 1998). It may appear on the record that wife is able to work, but there is no record evidence to support the trial court's imputation of $2,000 per month. Husband relies on the testimony of his accountant, Stephen Brown, but Brown's opinion was based on what he was told by husband and the very limited records that he found, which he acknowledged did not support husband's recollection that wife had earned as much as $30,000. The records he reviewed showed income of $1,725 for 1999 and a maximum annual earnings of $13,255.12, which was earned in 1982. He also acknowledged he could not testify about the earning capacity of wife as an artist. The trial court found that the $30,000 figure was not supported by evidence but, nevertheless, imputed $2,000 as a "reasonable sum." Without evidence to show what an artist of the skills currently possessed by wife could earn in the local economy, there was no basis for this imputation of income.[3] On remand, the court must reconsider the alimony issue without imputed income.
We also cannot find competent substantial evidence to support the trial court's decision to limit the marital home to five acres. The property was deeded to husband by Oren Brown to be the marital homeplace as a fifty-four-acre tract.[4] All fifty-four acres were fenced. The family treated the entire parcel as the family home and made use of all of it. Husband is adamant that their lifestyle was land, not money. This family may have been cash poor but it was land rich and the land's bounty and beauty were what they had and enjoyed in lieu of cash. The court's decision to limit this marital asset to five acres has no record support; rather it represents an artificial and arbitrary boundary. Five acres apparently was settled on because it held the house and major residential out-buildings. The exclusion of the other structures, however, reinforces the artificial nature of this configuration. We accordingly reverse on this point and remand for the lower court to equitably distribute the fifty-four-acre parcel as a marital asset.
Except for the boundaries of the marital home and the imputed income to wife, in all other respects the judgment is affirmed. We remand for further proceedings consistent with this opinion.
AFFIRMED in part; REVERSED in part; and REMANDED.
COBB, GRIFFIN and ORFINGER, R.B., JJ., concur.
NOTES
[1] At trial, Husband introduced deeds into evidence which showed that his father had conveyed parcels of land to his brother and the brother's wife, and his brother's daughter and her husband to suggest that Oren Brown had left Wife's name off the deeds on purpose.
[2] Also in 1993, wife gave birth to the twins.
[3] Under appropriate circumstances, a minimum wage level of income might be imputable but this would require consideration of the number of hours available for work. Husband acknowledges that the hours available for wife to work are the hours when the four minor children are in school.
[4] Although this property was in husband's name alone, under no view of the evidence could it be a nonmarital asset.