DREW, J.
| ¶Matt Banks was convicted by a jury of two counts of second degree murder, La. R.S. 14:30.1. He was sentenced to consecutive life sentences, without benefit of parole, probation, or suspension of sentence. He appeals, alleging insufficiency of the evidence in this circumstantial case. We affirm in all respects.

FACTS

Shortly after 11:00 p.m. on June 29, 2002, firefighters found the bodies of Irma Williams and her brother, Roy Tugler, inside their burning home at 1606 Hwy. 139 in Monroe, Louisiana. Each body revealed blunt force trauma. The body of Williams was partially burned and smelled of accelerant.
Williams and Banks were involved in a violent relationship for over a decade. They had recently broken up, and she was dating another man.
Authorities interviewed Banks on the day after the murders. His truck and home were searched and items removed for analysis. Also occurring on the day after this horrific event was the discovery of an iron plumbing pipe at the crime scene. Banks is a plumber. Human hairs were embedded in one end of the pipe along with what was believed to be blood. None of the physical evidence linked Banks to the crime scene. The case lay dormant for seven years.
In 2009, a former deputy revealed that a neighbor of Banks’s might have relevant information. The neighbor stated that on the night of the murders, he heard Banks talking loudly with Williams and then later saw Banks walking away from the neighborhood. After further investigation, 12Banks was arrested and indicted for two counts of second degree murder. He was convicted as charged.

TESTIMONY AT TRIAL

Michael Johnson testified that on June 29, 2002, he saw and immediately reported smoke at the burning home.
Ronald Daley testified that:
*58 • he was a Ouachita Parish fireman who responded to the emergency call;
• the fire department arrived four minutes after the call to find chest-high smoke coming from the house, indicating that the fire was just starting;
• an unresponsive female and male were found and removed from the home;
• both of the victims were dead;
• each body reflected massive blunt force trauma to the head;
• the female was burned from the head to just above the knees;
• the fire was small and concentrated in a side bedroom;
• a chair in the room appeared to be the focus point of the fire; and
• the fire was extinguished in less than a minute by 50-100 gallons of water.
Greg Thompson, a fire department investigator, testified that:
• he concluded that the fire was started in a bedroom by a person using an acceler-ant, gasoline;
• he was aware of no burns on the male victim; and
• the fire had burned for less than 30 minutes before fire personnel arrived.
Lt. Renee Smith testified that:
|s* at the time of the fire, she was a sergeant with the crime scene unit of the investigation division of the Ouachita Parish Sheriffs Office;
• both bodies had already been removed from the house when she arrived;
• Williams’s body was charred from her head to just above her knees;
• the odor of gasoline was noted on Williams’s body;
• there were no burn areas on Tugler’s body;
• she identified photographs and video taken at the crime scene;
• technicians noted a broken lamp, directional blood splatter, blood splatter on the headboard, and transfer evidence of blood;
• more directional blood splatter was found in the kitchen;
• dishes were turned over and broken, suggesting a possible struggle;
• the hallway also reflected signs of a struggle, including black shoe marks on the wall and indentations where apparently the weapon used struck the wall;
• upon returning to the crime scene the next day, technicians found a 22-inch plumbing pipe on the water-pooled floor in the front bedroom;
• the pipe had not been seen the night before, when the house was very dark;
• hair was on one end of the pipe, a sample of which was taken to the crime lab;
• nothing at the crime scene could be traced back to Banks;
• the material on the end of the pipe was from a human;
• no DNA evidence was recovered from the pipe or the hairs;
• a metal T-ball bat and a wooden bat were also found inside the house, but there was no indication that they had been used in either murder;
• technicians recovered a butane lighter in a walkway outside the house;
• a blood-soaked pillow was found in the yard;
14» investigators did not find Banks’s fingerprints or palm prints at the scene;
• only a trailer separated Banks’s house from the burned home;
• both homes had light poles out front;
• during a June 30, 2002, search of Banks’s house, several items were seized;[1]
*59 • no accelerant was found at Banks’s house, nor was any odor of an accelerant detected on any of his clothing;
• neither the items seized from his home nor those seized from his motor vehicle connected Banks to the crime scene;
• given the indications of a struggle and the large amount of blood, she assumed that had Banks been there, he would have had quite a bit of blood on him; and
• blood evidence can be destroyed by fire, diluted by water, or destroyed by some chemicals, such as are found in laundry detergent, the use of which makes the recovery of blood evidence quite difficult.
Capt. Larry Knight testified that:
• in 2002, he was an investigator with the Ouachita Parish Sheriffs Office;
• the night of the crimes, he sent to all local agencies a BOLO for Banks’s truck;
• Banks was located about 3:00 a.m. on June 30, 2002, at the residence of Beverly Connor on Outlet Road in Monroe;
• Banks voluntarily agreed to accompany the officers to the sheriffs office;
• he admitted that he and Williams had a violent relationship for 11 years, but they had become friends, though he hadn’t seen her for two weeks;
Is* Banks said that Williams had previously accused him of certain crimes and that he pled guilty to kidnapping and to stabbing her, but those charges were false;
• Banks said that Williams was a drug addict with a crack cocaine problem;
• Banks was angry about her drug use, and had called the Sheriffs Department on the day of the fire, reporting that Williams was dealing drugs;
• Banks didn’t like being broken up with Williams, who had a new boyfriend;
• on the day of the murders, Banks said that he was at home and saw Ronnie Hands walking in the neighborhood, looking for his dad;
• Banks never went to Williams’s house that day;
• Banks said he left his house around noon, went to get beer, and then went to his relative’s house on Outlet Road, where he played dominos;
• Banks said he later drank more beer at the home of someone named Steve, whose address he could not remember;
• Banks said he returned to the Outlet Road home and got his hair braided;
• Banks said he stayed there until officers contacted him around 3:00 in the morning, at which time he knew nothing of the fire or the deaths;
• Banks asked if Williams had been killed with a pipe or a bat, which surprised the officers, who were at that time unaware of the pipe at the crime scene;
• Banks allowed the officers to search his home and property;
• officers retrieved Banks’s phone records for the land line at his house;[2]
*60 |fi*he (Knight) took over the case about two days into the investigation and remained on the case throughout the year;
• none of the details were released to the public or to participating witnesses;
• no arrests were made but officers continued to investigate;
• after early 2003, there was no further activity in the investigation;
• he was transferred to patrol in 2004, ending his involvement in the case;
• Banks was very cooperative and neatly dressed during the interview, with no scratches, abrasions or bruises;
• Banks cried and was emotional during the interview;
• Williams’s last boyfriend, Michael Jones, was questioned, but had an alibi;
• Jones was never really considered a suspect, and his house was not searched;
• Jones would have been physically unable to kill the victims;
• his agency had information that Williams tried to buy drugs on the day before her death, along with a friend named Pauline, who provided confirmation;
• he never found out the identity of the alleged supplier;
• he knew of no drugs or drug paraphernalia found at the crime scene; and
• no evidence was recovered linking Banks to the crime scene.
Frank Anzalone testified that:
• he owned a Monroe hardware store that sold plumbing supplies;
• he had known Banks for 20 years, as he was a frequent customer;
• he had referred customers to Banks for odd jobs;
17* the pipe shown him at trial was sold from his store; and
• only his store and Ace Hardware carried that pipe brand in the Monroe area.
Eddie Barnes testified that:
• on the night of the fire, he was in the neighborhood, waxing his truck and listening to the radio, under a bright moon;
• there was a light right by Banks’s house;
• he saw Banks arrive in his white pickup truck about 10:00 or 10:30 p.m.;
• Banks usually parked in back of his house, but this time he parked out front;
• his cousin also noted that Banks had come home;
• he (Barnes) saw Banks exit the truck and head toward Ruthie Williams’s trailer, near the house of the victims, but he did not see Banks actually get to the house;
• after he finished waxing his truck, he and his nephews watched a movie at home; and
• later that night he heard the ambulance.
Michael Jones testified that:
• in 2002, he and Williams were dating, and he often stayed at her house;
• during the week before she was killed, Banks came over to her house and argued with her, calling her a bitch and a whore;
• he once saw Banks hiding in the woods, looking at him; .
• he (Jones) and Williams had lived together in a house off Jackson Street, but Williams’s aunt, Ruthie Williams, let her live in the house next to her trailer;
• she had been living there for about a month when the homicides occurred;
|s* on the date of the murders, Ruthie Williams took him home[3] to get his stuff;
*61 • only he, Ruthie Williams, and Tugler had been present when he left;
• he was planning on moving in with Irma Williams; and
• he knew about her drug usage.
Zandria Lollie testified that:
• at the time of the murders, she lived in Bastrop with her parents and her fiancé, Antonio Connor, who is a cousin to the defendant;
• she and Antonio were in Monroe that weekend, staying with his mother;
• on June 29, 2002, Banks came over mid-morning to play dominoes;
• her mom and stepdad picked her up so she could do her mother’s hair;
• about 9:00 p.m., she was still at her mother’s house when she received a phone call from Antonio, whose whereabouts were unknown to her;
• she hung up and went to Beverly Con-nor’s house on Outlet Road, arriving about 9:40 p.m., at which time she did not see Banks;
• hours later, Banks burst inside, sweaty and wearing muddy clothes;
• he said that he had done something bad but did not say what;
• he grabbed some cleaning supplies and a towel and went back outside;
• he returned with his truck seat covers, which he put into separate bags;
• she was helping Beverly Connor pack away old clothes when Banks returned;
• he changed into some of the clothes and bagged the garments he was wearing;
• Banks asked her to braid his hair, which was sweaty and wet;
13* he had never asked her to braid his hair before;
• while she was braiding his hair, Banks turned on a police scanner;
• she heard the police describing a truck like his, but when they read the license plate number, he sighed and said, “That ain’t my truck”;
• she heard the police talking about coming for Banks;
• he asked that she keep the seat covers at her mother’s house and she said no;
• she did not know what Banks did with the seat covers after that; and
• right before the police arrived, he got on the couch and faked being asleep.
Antonio M. Connor testified that:
• on June 29, 2002, he was living with his girlfriend, Zandria Lollie, and her mother and stepdad in Bastrop, Louisiana;
• that day he and Banks were drinking and playing dominoes at his mother’s house when they left to go to Steve’s house, where they drank more;
• that evening, they left Steve’s house, stopped at the store and then went to Banks’s house, where he (Connor) called Lollie in Bastrop;
• he and Banks returned to Beverly Con-nor’s Outlet Road home; and
• he never saw Banks again that day.
Kenneth Jones testified that:
• he was married to Charlotte Jones, who was the aunt of the victims;
• Williams and Tugler would often stay with them;
• Williams was a nice person who did not cause trouble;
• Tugler did not bother people, but he would defend himself, if needed;
• Tugler was very protective of his family, including Williams;
• he knew that Banks and Williams previously had a “raggedy” relationship;
| in* Banks and Williams often argued, and two weeks before Williams died, he *62 came home to find Banks pinning Williams and choking her;
• he went inside to get a gun, but came out unarmed, as Banks was leaving;
• Tugler walked up and spoke to his sister; and
• Banks yelled as he left that he was going to get all of them.
Charlotte Jones testified that:
• her niece was a sweet, loving, and kind person;
• Tugler was a loving and kind person, who was very protective of his family;
• she had known Banks for a long time, and he was very controlling;
• Williams and Banks had a rocky relationship and would argue all the time;
• Banks tried to keep Williams isolated from her and her husband; and
• she also saw Banks choking Williams two weeks before her death.
Capt. Jay Ellerman, testified that:
• on April 18, 1998, he was a corporal in the Ouachita Parish Sheriffs Office;
• on that date, he answered a domestic disturbance complaint made by Williams, who alleged that Banks had stabbed her twice on her thigh;
• she had scratches on and behind her ear, and facial swelling;
• he arrested Banks for aggravated battery and aggravated kidnapping; and
• Banks was prosecuted for aggravated battery and false imprisonment, and was placed on supervised probation for five years.
Tenisa Lyles, daughter of Irma Williams, testified that:
• her mother was a good person, sweet and nice, and not a fighter;
• Williams was a good mother, who took care of Lyles and her siblings;
she knew her mother had a drug problem;
• Tugler, her uncle, treated her like he was her father and was a gentleman;
• her mother dated Banks for about 10 years, during which time they lived off- and-on with him, their relationship being “horrible”;
• she did not know why Williams stayed with Banks, who would beat her and isolate her from her children, sometimes making her live in a tent;
• Banks said that if he could not have Williams then no one could; and
• she last saw her mother on Friday, June 28, 2002.
Deputy Larry Ludlow testified that:
• in June of 2009, he was an investigator with the Ouachita Sheriffs Department;
• he learned that an inmate named Mario Greely had information on the murders;
• he had dealt with Greely before during his time with the Sheriffs Department;
• Greely told him that on June 29, 2002, he was across the street from Williams’s house and saw Banks walking away from there about the time of the murders;
• the facts Greely gave him were consistent with what he knew about the case;
• he (Ludlow) lived not far from the area where Williams, Banks, and Greely lived in 2002, and people often hung out in that neighborhood; and
• he felt Greely’s statement provided probable cause to arrest Banks.
Gene Benoit, a former sheriffs deputy, testified that:
• he owned a car wash and storage facility, and Williams had been a customer for about 10 years, and had rented storage space on two or three occasions;
each time, Williams had serious arm and leg injuries and she told him that *63 she had been beaten by Banks and she was trying to get out of the situation; and
• he had known Banks for about 30 years.
Mario Greely testified that:
• he lived on Burkes School Road, off of Hwy. 139;
• he had known Tugler for about five years and knew of Williams;
• he had known Banks all of his life, about 36 years;
• he lived across the highway from Banks, about 100 yards away;
• he did not know that Williams and Tu-gler were sharing a house in 2002, but he knew that Tugler lived two houses down from Banks;
• in 2002, people would hang out and drink every day around a tractor tire about 100 yards directly across the street from where Williams and Tugler lived;
• nothing blocked the view from that tractor tire to the house;
• on the day of the murders, he had been hanging out at the tractor tire when Williams and Tugler joined him during the early part of the afternoon;
• Banks asked Williams to go across the street with him, but she refused;
• in the early evening, he heard Williams and Banks arguing in her house;
• he later looked up and saw Banks walking along the fence line that runs along the back of the properties, heading toward his house;
• Banks was not wearing a shirt when he saw him;
• Greely continued to sit and drink for a while until he went home about 9:00 p.m., about 90 minutes before the fire trucks began arriving;
• when Ludlow interviewed him in June of 2009, he was in jail;[4]
|1S* he (Greely) took Tugler to buy crack cocaine, without Williams;
• no one else was in the area where he was sitting at the time he saw Banks;
• at that point he had been drinking, but he was not intoxicated; and
• he heard no yelling or screaming that night, nor did he hear Banks make any threats to Williams earlier that day at the tractor tire.
Dr. George McCormick, who conducted the 2002 autopsies, was deceased at the time of trial.
Dr. Frank Peretti was accepted by the court as an expert in the field of forensic pathology, and he studied Dr. McCormick’s autopsy report. He testified that:
• the bodies were exhumed on January 28, 2011;
• he conducted a second autopsy of both victims on January 29;
• on review of photographs taken in 2002 of Tugler’s body, Peretti noted blunt force trauma to the head with multiple lacerations and massive multiple fractures of the skull, with skull bones being imbedded in the brain;
• the blunt force injury led to three types of hemorrhage;
• there were four or five impact sites on Tugler’s skull with massive crushing injuries, blows which would have rendered Tugler immediately unconscious;
• he concurred with McCormick’s assessment that the cause of Tugler’s death was multiple blunt force head injuries;
• Williams had post-mortem thermal burns and multiple impact sites;
• autopsy photos indicated a pattern of injuries consistent with a valve on a pipe;
• he concurred with McCormick’s finding of 23 lacerations on Williams’s body;
*64 • Williams’s cause of death was blunt force head trauma; and
|14* at death, both victims had cocaine in their system.
Linda Armstrong, director of the North Louisiana Crime Lab, was accepted as an expert in the field of DNA analysis. She testified that:
• an organic stain does not always translate into a DNA analysis;
• an accelerant similar to gasoline was on Williams’s hair and clothing;
• the hairs from the iron pipe had no root material, preventing DNA analysis;
• the pipe was swabbed for suspected blood and a cluster of hair and fuzz was collected from the pipe, all of which lacked DNA material;
• the only DNA found at the scene was that of the two victims;
• if the pipe had sat submerged in water, there would be no remaining blood or DNA cells left by skin shed on contact with the pipe;
• Banks’s truck was thoroughly searched by the crime lab;
• even though Banks had driven the truck for many years, absolutely no DNA was recovered from the vehicle, not even his own;
• seat covers would normally reveal the most DNA material;
• scrubbing the seats with detergent would destroy any DNA present; and
• none of the physical evidence analyzed connected Banks to the crime scene.

DISCUSSION

Banks posits that this record is insufficient to sustain any conviction.
Banks was charged and convicted of violating La. R.S. 14:30.1, second degree murder, the elements of which can be satisfied by proving the killing of a human being with the specific intent to kill or inflict great bodily harm.
| ]5Our law on appellate review of sufficiency questions is well settled.[5]
*65 11 (¡There is no physical evidence tying Banks to these homicides.
The total absence of any DNA material in his truck, however, suggests that he sanitized the vehicle. Fire and water destroyed the perpetrator’s DNA at the murder scene. Banks changed clothes and discarded the garments he had worn that night. His own words admitted doing something wrong. More circumstantial evidence is reflected by Banks’s conduct just after the killings, including cleaning his truck late at night, changing clothes, asking someone to keep the seat covers in Bastrop, disposing of his clothes and his seat covers, and pretending to be asleep when the police arrived. He lied about his location that evening, according to the cell phone evidence. He was a violent man, and he had harmed Williams before.
Testimony by Greely and Jones contradicted Banks’s statement about not having seen Williams for two weeks prior to her death. The afternoon before her death, Jones saw and heard Banks arguing with her. Greely saw him talking to her at the tractor tire that afternoon, and heard them talking at her home that evening.
Banks’s actions suggest that after 10 years of violence, he was not going to leave her alone even though they had broken up and she was dating someone else.
The jury weighed the credibility of all witnesses. The verdict suggests the state’s witnesses were credible. Such determinations of weight and credibility, by the fact finder are given great deference and are not reassessed on review.
117The jury could have reasonably found that Banks killed Williams and Tugler. As he was a plumber, he obviously had on hand, or could easily obtain, the likely murder weapon, a plumbing pipe with a valve on one end. He had a history of violence regarding Williams, and he had recently choked her. In the days before the killings, he had threatened the victims. He was intent upon continuing the violent relationship, even though she had a new boyfriend. He admitted being angry with *66 Williams, and he placed nine phone calls that day to turn her in for drug dealing. In a depraved story as old as time, he did not want another man to have her.
Banks had the opportunity, the means, the physical ability and the emotional outrage necessary to kill both victims. His specific intent to kill[6] is evidenced by the massive blunt force trauma to both victims. He burned her, then went to great lengths to cover up his crimes — and he got away with it for seven years.
That evening, Banks frantically told Lol-lie that he had done something wrong. He then set about to destroy evidence by removing all DNA from his vehicle, by disposing of his clothes and car seat covers, and by lying to law officers about where he had been that day and when he had last seen Williams. His monitoring of the police scanner and feigned sleep also speak volumes. His own words and actions proved beyond a reasonable doubt that he committed these atrocities.
No evidence contradicts the state’s theory. Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have |1sfound that all elements of these second degree murders were proven beyond a reasonable doubt.

DECREE

The defendant’s convictions and sentences are AFFIRMED.

. Among the seizures: a 24-inch iron gas pipe, taken from the gas heater in his bed *59 room, wood flooring, cabinet doors, floor tile, the back door, boots, and black leather loafers. Smith said that all possible bloodstains on these items were dried, making it difficult to determine when they were made. A washing machine, filled with wet clothes, was also taken.

.
• On the morning of June 29, 2002, Banks called the Ouachita Parish Sheriff's Department six times: at 10:23, 10:50, 10:54, 10:56. 10:57. and 11:48:
• during the 10:57 call he left an anonymous message that drugs were being dealt at the victims' residence at 1606 Highway 139;
• at 10:48 and 10:50 a.m., Banks called the Monroe Police Department;
• at 10:52 a.m., Banks called Metro Narcotics;
• at 12:01 p.m., a phone call to the plumbing supply warehouse was made;
• at 4:30 p.m., a call was made to Beverly Connor’s home on Outlet Road; and
*60 • at 9:09 p.m., a call was made to a number belonging to Chasity Bradshaw at 10645 Parkwood Drive, Bastrop, Louisiana, where Zandria Lollie lived.

. Jones had physical disabilities, necessitating his dependence on others for transportation.

. He was incarcerated for possession of marijuana, a charge later dropped.

. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Davies, 35,783 (La.App.2d Cir.4/5/02), 813 So.2d 1262, writ denied, 2002-1564 (La.5/9/03), 843 So.2d 389, citing La. R.S. 14:10(1).
In Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court held that the proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. On appeal, a reviewing court must view the evidence in the light most favorable to the state and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. Jackson v. Virginia, supra. Having been fully implemented by the Louisiana Supreme Court and legislatively enacted in La. C. Cr. P. art. 821, the Jackson reasonable doubt standard is now the only standard of review of facts for Louisiana appellate courts. See State v. Mitchell, 1999-3342 (La.10/17/00), 772 So.2d 78.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Macon, 2006-481 (La.6/1/07), 957 So.2d 1280; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, supra.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, 43,786 (La.App.2d Cir.1/14/09), *65 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
The facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, supra.
Direct evidence provides proof of the existence of a fact, for example, a witness’s testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. The trier of fact is charged with weighing the credibility of this evidence, and on review, the same standard as in Jackson v. Virginia is applied, giving great deference to the fact finder’s conclusions. Id.
When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; State v. Lilly, supra. Once the reviewing court determines what reasonable inferences may be drawn from the circumstantial evidence, it then must determine whether they exclude all reasonable, not all possible, theories of innocence. Id.

. The intent required to prove second degree murder could be the lesser standard of specific intent to inflict great bodily harm.