STONE, J.
*151 Following a jury trial, the defendant, Danny Harris, was found guilty as charged of aggravated flight from an officer. Harris was sentenced to serve 3½ years at hard labor and now appeals his conviction. For the following reasons, Harris' conviction and sentence are reversed.
FACTS AND PROCEDURAL HISTORY
Danny Harris ("Harris") was arrested on July 19, 2017, and charged with aggravated flight from an officer in violation of La. R.S. 14:108.1(C). The jury trial began on January 25, 2018, with the following testimony by Agent Joseph Bassett ("Agent Bassett") and Agent Carlos Glass-Bradley ("Agent Glass-Bradley"), of the Shreveport Police Department.
Agent Bassett testified that on July 19, 2017, around 12:45 p.m., he was driving his police vehicle east on Lakeshore Drive near the intersection of Hearne Avenue. Agent Glass-Bradley was in the passenger seat. On this particular day, the agents were working in the Street Level Interdiction Unit, a police unit which handled street-level narcotics offenses in high crime areas. The agents noticed a silver Hyundai traveling west on Lakeshore Drive, heading in their direction. Each agent testified they first noticed the Hyundai, because it had damage to it. Agent Bassett noticed the driver was not wearing his seatbelt. Agent Bassett asked Agent Glass-Bradley to confirm the driver was not wearing his seatbelt, which he did.
Agent Bassett executed a U-turn and activated the lights and sirens on the police vehicle. Agent Bassett testified the police vehicle was standard for street level interdiction --- a dark blue Ford sedan with no markings identifying it as a police vehicle. The agents testified the police vehicle had a spotlight mounted above the driver's side mirror, emergency lights mounted on either side of the rearview mirror, and a camera unit ("MVS") mounted below the rearview mirror. Ordinarily, when police officers activate their lights and/or sirens in their vehicles, the MVS will turn on. Both Agent Bassett and Agent Glass-Bradley testified that the MVS was not working that day, and that it had malfunctioned a number of times before and after that date.
The agents testified the lights and siren could be seen and heard from a distance, and the Hyundai was close enough to their police car for the driver of the Hyundai to have seen and heard both. The driver of the Hyundai slowed down briefly after the agent engaged the lights and siren but then sped away from the police vehicle and turned south on Exposition Street. Agent Bassett testified the Hyundai "ran a stop sign at West College, Lillian, and Stonewall, I believe." Agent Glass-Bradley testified the Hyundai ran four stop signs on Exposition Street. This particular area of Exposition Street is a residential neighborhood with no sidewalk and has foot and car traffic.
The Hyundai turned west on Frederick Street, and the agents saw the driver throw a black item out of the passenger side window. According to Agent Bassett, the Hyundai then ran two stop signs at Milton Street and San Jacinto Avenue, before turning south onto San Jacinto. The agents did not stop to retrieve the package thrown from the Hyundai, because they wanted to first detain the driver.
Agent Bassett testified the Hyundai sped up on San Jacinto to at least 50 mph in a 25 mph speed zone. Both agents testified they knew the Hyundai's speed because they used "pacing," a tactic in which a police officer tries to maintain the same distance between the police vehicle and the *152 vehicle being pursued. Pacing allowed the agents to determine the Hyundai's speed by simultaneously noting the speed at which the agents were traveling.
San Jacinto is also a residential street without a sidewalk. The Hyundai ran several more stop signs on San Jacinto before turning and heading east on Greenwood Road. Agent Bassett paced the Hyundai at about 55 mph on Greenwood Road where the speed limit was 35 mph. Greenwood Road is a high traffic, four-lane street. The Hyundai turned south onto Velva Avenue, which becomes Bolinger Drive, and runs west alongside the state fairgrounds. Agent Bassett testified he had to drive 60 mph to keep up with the Hyundai on Bolinger Drive, which is in a 25 mph speed zone. Agent Glass-Bradley testified there was a driving class going on at the fairgrounds at the time.
The Hyundai then turned south onto Hudson Avenue. The Hyundai ran the stop sign at Hudson Avenue and Midway Avenue and went through a construction zone. The driver then turned east onto Lindholm Street, which turns into Malcolm Street. The Hyundai ran a red light at the intersection of Malcolm and Hearne Avenue. Hearne Avenue is a busy road, and the agents were nearly "t-boned" by a car entering the intersection. The Hyundai turned south onto Virginia Avenue and then west onto Vivian Street. Thereafter, the driver stopped at a residence, exited the Hyundai, and fled on foot.
The agents called for a K-9 unit which located the driver, Harris, hidden between the shed and the fence of a residence on Murray Street. Agent Bassett testified Harris came from behind the shed with his hands up. When Agent Bassett reached for Harris' hand, Harris pulled away, and Agent Bassett struck Harris in the face with a closed fist. Harris was given a Miranda warning by Agent Bassett and another officer who subsequently arrived on the scene. Harris told both officers he understood his rights. When asked why he ran, Harris responded he did not have a driver's license.
Agent Glass-Bradley testified that, about ten minutes after Harris was arrested, he and a few other officers attempted to find the black package thrown from Harris' car near Exposition and Frederick. However, because the area had high grass and an abundance of trash, the officers were not able to find the package.
Harris exercised his right to remain silent and elected not to testify. The jury returned a unanimous verdict of guilty as charged. The trial court ordered a presentence investigation. Thereafter, Harris filed a pro se motion for post-verdict judgment of acquittal and a pro se motion for a new trial. The trial court considered the motions on March 12, 2018, and found the state had proven all elements of the offense beyond a reasonable doubt. The motions were denied, and the trial court sentenced Harris.[1]
In sentencing Harris, the trial court complied with the factors in La. C. Cr. P. art. 894.1, and considered the trial testimony, Harris' criminal history, the likelihood that Harris would re-offend, and his need for correctional treatment. The trial court sentenced Harris to 3½ years at hard labor with credit for time served pursuant to an agreement between Harris and the Caddo Parish District Attorney's Office, *153 whereby Harris could appeal his conviction, but not his sentence. The trial court advised Harris of the time delays to seek an appeal of his conviction and to seek post-conviction relief once his conviction and sentence became final. This appeal ensued.
DISCUSSION
On appeal, Harris argues the state failed to prove beyond a reasonable doubt that the officers had reasonable grounds to believe Harris committed an offense prior to the chase. Harris also argues the state failed to prove beyond a reasonable doubt that the agents were driving a marked police vehicle, as required for a conviction of aggravated flight from an officer.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason , 43,788 (La. App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied , 09-0725 (La. 12/11/09), 23 So.3d 913, cert. denied , 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010) ; State v. Hill , 42,025 (La. App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied , 07-1209 (La. 12/14/07), 970 So.2d 529.
Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. State v. Lilly , 468 So.2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Lilly , supra ; State v. Robinson , 47,437 (La. App. 2 Cir. 11/14/12), 106 So.3d 1028, writ denied , 12-2658 (La. 5/17/13), 117 So.3d 918. The trier of fact is charged with weighing the credibility of this evidence and on review, the same standard as in Jackson v. Virginia is applied, giving great deference to the fact finder's conclusions. State v. Hill , 47,568 (La. App. 2 Cir. 9/26/12), 106 So.3d 617.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover , 47,311 (La. App. 2 Cir. 10/10/12), 106 So.3d 129, writ denied , 12-2667 (La. 5/24/13), 116 So.3d 659 ; State v. Speed , 43,786 (La. App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied , 09-0372 (La. 11/6/09), 21 So.3d 299. The trier of fact is charged to make credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000) ; State v. Woodard , 47,286 (La. App. 2 Cir. 10/3/12), 107 So.3d 70, writ denied , 12-2371 (La. 4/26/13), 112 So.3d 837.
*154 La. R.S. 14:108.1 provides the following definitions regarding aggravated flight from an officer:
A. No driver of a motor vehicle or operator of a watercraft shall intentionally refuse to bring a vehicle or watercraft to a stop knowing that he has been given a visual and audible signal to stop by a police officer when the officer has reasonable grounds to believe that the driver has committed an offense. The signal shall be given by an emergency light and a siren on a vehicle marked as a police vehicle or marked police watercraft.
* * * *
C. Aggravated flight from an officer is the intentional refusal of a driver to bring a vehicle to a stop or of an operator to bring a watercraft to a stop, under circumstances wherein human life is endangered, knowing that he has been given a visual and audible signal to stop by a police officer when the officer has reasonable grounds to believe that the driver or operator has committed an offense. The signal shall be given by an emergency light and a siren on a vehicle marked as a police vehicle or marked police watercraft.
D. Circumstances wherein human life is endangered shall be any situation where the operator of the fleeing vehicle or watercraft commits at least two of the following acts:
(1) Leaves the roadway or forces another vehicle to leave the roadway.
(2) Collides with another vehicle or watercraft.
(3) Exceeds the posted speed limit by at least twenty-five miles per hour.
(4) Travels against the flow of traffic or in the case of watercraft, operates the watercraft in a careless manner in violation of R.S. 34:851.4 or in a reckless manner in violation of R.S. 14:99.
(5) Fails to obey a stop sign or a yield sign.
(6) Fails to obey a traffic control signal device.
Additionally, La. R.S. 32:295.1 outlines the reasonable grounds for a traffic stop:
A. (1) Each driver of a passenger car ... in this state shall have a safety belt properly fastened about his or her body at all times when the vehicle is in forward motion.
* * * *
F. Probable cause for violation of this Section shall be based solely upon a law enforcement officer's clear and unobstructed view of a person not restrained as required by this Section. A law enforcement officer may not search or inspect a motor vehicle, its contents, the driver, or a passenger solely because of a violation of this Section.
Reasonable Grounds for a Traffic Stop
All that is required for a law enforcement officer to have probable cause to initiate a traffic stop for a seatbelt violation is a clear and unobstructed view of a person in a vehicle who is not wearing his seatbelt while the car is in forward motion. Id. Here, Agents Bassett and Glass-Bradley testified they each clearly saw the driver of the Hyundai was not wearing a seatbelt. The officers had probable cause and, therefore, reasonable grounds to pull Harris over for a seatbelt violation. See State v. Hunt , 09-1589 (La. 12/1/09), 25 So.3d 746 ; see also State v. Evans , 48,489 (La. App. 2 Cir. 12/4/13), 130 So.3d 406.
Requirement of a Marked Police Vehicle
As stated above, a conviction under La. R.S. 14:108.1 requires the law *155 enforcement officer pursuing a suspect in his police vehicle to first give a visual and audible signal to stop, and "the signal shall be given by an emergency light and a siren on a vehicle marked as a police vehicle ." Given the language of the law, it appears the legislature did not consider a vehicle equipped solely with emergency lights and a siren to be "marked as a police vehicle."
In State v. Williams , 46,674 (La. App. 2d Cir. 12/14/11), 81 So.3d 220, this Court stated, " La. R.S. 14:108.1 refers to the crime of flight from an officer, an offense not charged in these proceedings. The use of lights, siren, and a marked police unit are among the elements required for proof of the crime of flight from an officer." In Williams , the officer who attempted to stop Williams had conducted surveillance on Williams to discover evidence of suspected drug activity. Just prior to an alleged drug buy with a criminal informant, the pursuing officer witnessed Williams make a turn without engaging his turn signal. After the drug buy occurred, Williams saw the officer's unmarked police vehicle and fled; the officer pursued Williams, engaging his emergency lights. Williams was apprehended by the officer in the unmarked vehicle and ultimately charged with possession of cocaine, but he was not charged with flight from an officer.
In the unreported case State v. Meads , 07-848 (La. App. 3 Cir. 1/30/08), 2008 WL 241595, writ denied , 08-0681 (La. 10/10/08), 993 So.2d 1281, narcotics detectives came upon a vehicle containing two suspects parked in the wrong direction, partially obstructing the roadway. As the detectives blocked the vehicle, they observed the owner of the vehicle, a known drug offender, exit the passenger side of the vehicle; Meads was in the driver's seat. The detectives, wearing clothing clearly identifying themselves as sheriff's deputies, exited their unmarked van and approached the vehicle. Simultaneously, Meads reversed the vehicle at a high rate of speed and eventually came to a stop in a ditch. One of the officers approached the passenger side of the vehicle with his gun drawn and ordered Meads to exit the vehicle. A struggle ensued between the officer and Meads, and the officer's gun discharged. The bullet hit and killed a different officer. During a search of the vehicle incidental to arrest, officers discovered cocaine. Meads was charged with several counts, including one count of aggravated flight from an officer, but that charged was later dismissed pursuant to an Alford plea.
In an opinion from the Louisiana Attorney General ("AG"), the AG's office considers the role that an unmarked police vehicle plays in initiating a traffic stop. La. Atty. Gen. Op. No. 06-0319, 2006 WL 3898234. The AG opinion directly discusses La. R.S. 14:108.1(C) stating, "[I]t would be difficult, if not impossible, to obtain a conviction on someone who flees an unmarked police car under the current law."
Given that La. R.S. 14:108.1 expressly requires the use of a marked police vehicle, we must reverse Harris' conviction. The photos of the police car Agent Bassett was driving show the front, rear and both sides of the vehicle. There is no marking on the car itself which states it is a police vehicle. Under La. R.S. 14:108.1, a police vehicle being equipped with emergency lights and a siren is not sufficient in order to obtain a conviction; the vehicle must also be marked as a police vehicle. The vehicle Agent Bassett was driving had emergency lights, a siren, a spotlight, and MVS equipment. None of these items mark the vehicle as a police vehicle.
*156 Additionally, jurisprudence involving an unmarked vehicle note the presence of marked vehicles being called for backup. Here, while other officers were on the scene when Harris was arrested, there is no testimony or video evidence that other officers, possibly in marked cars, participated in the pursuit of Harris. The requirements of La. R.S. 14:108.1 were not met in this case. Accordingly, Harris' conviction for aggravated flight from an officer is reversed.
CONCLUSION
For the foregoing reasons, Harris' conviction and sentence for aggravated flight from an officer are reversed.
CONVICTION AND SENTENCE REVERSED.

There is no express waiver of sentencing delay on the record. The defendant makes no complaint regarding the absence of an express waiver on appeal. In State v. White , 404 So.2d 1202 (La. 1981), the court held that failure to expressly waive the sentencing delay in La. C. Cr. P. art. 873 is harmless if there was no prejudice to the defendant and the defendant does not raise any complaint about it.