CARAWAY, J.
| j David Jerome Manning, Jr., was charged by bill of information with possession of marijuana, methylenedioxymethca- *349 thinone (ecstasy), and cocaine "with intent to distribute (La. R.S. 40:966, 967).[1] A jury convicted him of the three felony charges and Manning was subsequently sentenced to concurrent sentences of 21 years at hard labor on the marijuana conviction, 21 years at hard labor, the first 2 years without benefits, on the cocaine conviction and 21 years at hard labor, 5 years without benefits, on the ecstasy conviction. No fines were imposed and no motion to reconsider sentence was filed.[2] Manning now appeals his convictions and sentences for the felony drug offenses. For the following reasons, we affirm.

Facts

As police conducted random patrol in the late evening hours of March 28, 2013, in a high-crime area of West Monroe, Louisiana, they observed an individual, who later identified himself as David Manning, backing a light-colored vehicle out of a driveway with the driver’s window down. Upon seeing the police vehicles, Manning pulled the vehicle right back into the yard. When Manning exited the vehicle without turning the engine off, police approached him for questioning. After investigating the vehicle, police observed two plastic bags containing marijuana and crack cocaine, in plain view on the front passenger seat of the ear. When he opened the passenger door to retrieve the 12plain view evidence, an officer saw a third plastic bag containing 27 unidentified capsules on the passenger seat. As police entered the driver’s side of the vehicle to turn the engine off, a razor blade and digital scale containing white residue were seen in the door panel compartment and a cell phone on the driver’s seat. Manning was charged with possession of marijuana, cocaine and ecstasy[3] with intent to distribute. A unanimous jury found him guilty of the three felony charges. For these offenses, Manning received three concurrent 21-year sentences for the drug felonies, with the first two years without benefits on the cocaine conviction and five years without benefits on the ecstasy conviction.[4] This appeal ensued.

Sufficiency of the Evidence

On appeal, Manning contests the sufficiency of the evidence to convict him of the three felony drug charges. .He argues that the entire case is based on circumstantial evidence and that the testimony of the officers who stated they observed him exit the vehicle was questionable. He further argues that the evidence was insufficient to support his alleged intent to distribute because the officers found no money or weapons and a minimal amount of drugs.
The trial testimony included the testimony of Monroe Police Officer Corporal Jonathan Chapman. He testified that during the late evening hours of March 28, 2013, *350 two unmarked patrol cars were making regular patrols in the high-crime neighborhood of Magnolia Street Park in West Monroe. Chapman |shad personally participated in numerous drug arrests in the area. On the night in question, Chapman was driving the lead patrol car down Short Washington Street, a narrow, almost one-lane road, when he observed a light-colored vehicle, located about half a block from him. The vehicle started to back out into the street from a residence to travel in his direction. Chapman did not see any other individuals or vehicles moving-around the área at the time. When the driver of the vehicle saw the marked unit, he quickly pulled back into the yard. Chapman testified that through the open driver’s window, he was able to make eye contact with the driver of the vehicle, a black male wearing a white T-shirt. Chapman found this behavior, and the fact that the car window was down on a chilly night, suspicious. He proceeded to the end of Short Washington Street and looped onto the next street over (Flynn Street) and blacked out (parked and turned off his lights). He positioned his vehicle next to an empty lot which allowed him an unobstructed view of the subject car and house from the neighboring street. He described the lot as a “junkyard,” that contained an unpaved trail from Short Washington to Flynn Street. Upon seeing the suspicious activity, he had also radioed the following patrol car to “keep an eye on” the vehicle. Chapman testified that while on Flynn Street, he personally watched the driver of the vehicle exit the driver’s side. He confirmed that he never lost sight of the car and that nobody else approached the car, crawled under or exited it.
Upon the driver’s exit from the vehicle, officers in the second patrol car stopped and approached the man who had left the car running. Manning identified himself to the officers. Chapman returned to the scene and joined the other officers questioning Manning, who denied any knowledge of the |4vehicle or that he was driving it. Chapman testified that he recognized the man who exited the vehicle as the same man driving the vehicle and the defendant in court.
Because he believed that “something else was going on with the vehicle,” Chapman walked toward the car and looked in with his flashlight. On the front passenger seat he saw two plastic bags that contained what appeared to be marijuana and cocaine. The bags were tied with knots and later determined to contain marijuana and crack cocaine. Chapman opened the vehicle on the unlocked passenger side and saw another plastic bag containing 27 unidentified capsules on the passenger seat. These pills were later identified as ecstasy. Chapman estimated the three bags to be within two to three feet of the driver’s location. No fingerprints were obtained from the bags. Chapman testified that he then realized the- car was running, and opened the driver’s side door to turn off the engine. There he observed a digital scale and a razorblade in the door panel compartment and a white cell phone on the driver’s seat. Manning was arrested by the officers at that time.
Chapman estimated that the value of the marijuana and cocaine was $400 and the ecstasy between $10-$15 a pill. He testified that he had previously recovered scales in association with drug sales.
When questioned about the charges of possession with intent to distribute, Chapman testified:
Q: All right. And what indicated to you intent to distribute?
A: Numerous pills, scales, the way it was packaged. And also smoking *351 weed or smoking crack, usually a user, we usually find stuff like a crack pipe or a marijuana smoking device or rolling papers. There was nothing that stated that he was actually a drug user. Everything — as far as everything was | ¡^packaged, from my experience, showed that he was a drug seller.
Chapman further explained that he told Manning that everything found in the car showed distribution, including the scales which “looked like he had been cutting crack.”
Chapman stated that as he approached the vehicle, he had seen another man sitting on the porch of the home where the car was parked. The man on the porch, who identified himself as Nino Wright, told Chapman that it was Manning who drove the car. Wright also informed Chapman that his backpack was somewhere in the vehicle. Chapman located the backpack in the backseat of the vehicle, searched it and gave it to Wright. Wright denied that the drugs belonged to him.
Shortly after Manning was arrested, his sister, LaTonya Manning, arrived at the scene and informed Chapman that the vehicle belonged to her. She told officers that she had given her cousin, not her brother, Manning, permission to use the car earlier in the day. LaTonya Manning denied any knowledge that the vehicle was being used for illegal drug activity. Chapman testified that he had her call her brother’s cell phone and that the phone in the vehicle rang, indicating that it belonged to Manning. The vehicle was released to LaTonya Manning that evening.
On cross-examination, Chapman stated that he knew nothing about LaTonya Manning’s or Nino Wright’s criminal records. He admitted that he had no phone records to show that the telephone recovered in the vehicle belonged to Manning. Chapman also testified that no money was found on Manning.
| f,Officer Jered Eppinette testified that he was the passenger in the second patrol car driven by Corporal Jared Desadier. The second car was about 80 to 40 feet behind Chapman’s vehicle. Eppinette confirmed that Chapman asked the officers in the following vehicle to keep an eye on the subject car, which was the “only car on the block setting [sic] in a yard, parked, running.” He considered this to be suspicious at that time of night and in a neighborhood where “a lot of burglaries” occur. Although the officers were forced to make a U-turn, Eppinette never lost sight of the car. After they turned their car around to face the vehicle, Eppinette saw a black male wearing a white T-shirt exit the vehicle on the driver’s side and walk away from the vehicle “toward the field.” The officers in the second patrol exited their car and approached the individual, later identified as the defendant, David Jerome Manning. Eppinette testified that he instructed Manning to stop three times and had to raise his voice to get-Manning to halt.
Officer - Eppinette escorted Manning to the patrol car, read him his rights and began to question him about the vehicle. Eppinette also saw “a guy sitting on the front porch of the house,” who did not act suspiciously and “never moved.” He confirmed that it was “chilly outside.”
On cross-examination, Eppinette admitted that as he drove by the car, the window was already up and he did not see it down at anytime. He did not know how many people were in the car. Eppinette did not recall seeing any foot traffic at the scene. He did not know if anybody put something in the car during the time he walked toward Manning. Eppinette admitted that he did not find weapons, knives or money on Manning. He was also un *352 aware of Wright’s drug |7record. Eppi-nette recalled that LaTonya Manning gave Chapman consent to search her vehicle where the drugs had already been observed by the officers. •
LaTonya testified that she had given her car to her cousin, John Manning, earlier in the evening so that he could pick up some medicine for her from the pharmacy. La-Tonya denied knowledge of drugs, razors or scales in her vehicle or that she .gave the car to her brother earlier in the evening. She testified that she arrived at the scene after “a friend” called her about her vehicle being parked “over there.” When she got to the.scene, her brother was in the back of a police car. LaTonya recalled seeing other people across the street and on the porch of the house. Police released the vehicle to her that night. She admitted that she had a prior felony drug conviction for attempted distribution of cocaine. LaTonya could not recall if the police asked her to dial her brother’s cell phone number, but she remembered there was an issue with the telephone.
Nino Wright testified that he knew the defendant. On the night in question, he was sitting on the porch of a friend’s house where Manning parked the car. Wright testified that he saw nobody else in the car with Manning. When he came out of the house that night, Wright saw Manning in the field talking to a woman and two other individuals. He did not see their hands or whether they exchanged anything. Shortly thereafter, Wright saw police arrive.
Wright had the owner of the house call Manning earlier because Manning was supposed to come pick him up and give him a ride to collect money from the sale of his mother’s car. Wright added that, earlier in the afternoon, he had left his backpack in the backseat of the vehicle Manning was driving.
|sOn cross-examination, Wright inconsistently testified that he saw Manning drive the car, but then stated that he did not. He admitted that he did not see Manning pull out and return to the yard, but consistently stated that he saw Manning exit the vehicle on the driver’s side and saw nobody else get out of the car.
Sergeant Mark Johnson, Media Relations and Crime Stoppers Coordinator for the Monroe Police Department, testified as an expert in packaging and distribution of illegal drugs, including street level. Johnson had no personal knowledge of the incident but testified that the block of Short Washington and the field across the street were a “hotbed” of illegal drug activity and burglaries as of March 28, 2013.
According to Johnson, the packaging of the varying types of drugs found-in the vehicle was more consistent with sales rather than personal use. In support of this opinion, he noted that there was no pipe or other smoking device found, which indicates that Manning was not using the drugs. He testified that a lack of means to smoke would make him think “right off the bat it’s possession with intent to distribute.” Johnson testified that personal users buy marijuana by the pound, because they get a better deal and that the packaging of the marijuana and 27 pills was consistent with street level distribution. He estimated the value of all of the drugs found in the vehicle to be approximately $1200.
Johnson noted that safety razors, like the one found in the vehicle, are associated with distribution of drugs and are commonly used for cutting up cocaine. He testified that scratches and white powdery residue on the scales Rand razor further indicated a selling operation rather than personal use and showed that the dealer was set up for sale from the vehicle.
*353 Johnson acknowledged that the lack of money found on Manning or in the vehicle was a missing factor. However, he noted that it may have been that he had just gotten started selling, that there was another party who was the “money guy,” or that the dealer did not want to keep the drugs and money together in case he was robbed. Johnson testified that it was not unusual for the money to be “in a culvert or in a ditch.”
Susan Foley, forensic chemist with the West Monroe North Louisiana Crime Lab, confirmed that the substances found in the vehicle driven by Manning were marijuana, cocaine and a type of ecstasy containing 3, 4 methylenedioxymethcathinone, a substituted Cathinone, which is a Schedule I substance.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold , 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d C3r.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
| inThe standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La. App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 08-0499 (La.l1/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.l 1/6/09), 21 So.3d 297. It is not the function of a reviewing court to assess credibility or reweigh evidence. State v. Marcantel, 00-1629 (La.4/3/02), 815 So.2d 50; State v. Carter, supra. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
Direct evidence provides proof of the existence of a fact, for example, a witness’ testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. For circumstantial evidence to convict, it must exclude every reasonable | nhypothesis of innocence. La. R.S. 15:438. Where an essential element of the crime is not proven by direct evidence, La. R.S. 15:438 applies. That rule restrains the fact finder, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypoth *354 esis of innocence is excluded. State v. Lilly, supra.
The trier of fact is charged with weighing the credibility of both direct and indirect evidence and on review, the same standard as in Jackson v. Virginia is applied, giving great deference to the fact finder’s conclusions. State v. Lilly, supra. The facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La. App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant’s actions. State v. Allen, 41,548 (La.App.2d Cir.11/15/06), 942 So.2d 1244, writ denied, 07-0530 (La.12/7/07), 969 So.2d 619; State v. Thornton, 47,598 (La.App.2d Cir.3/13/13), 111 So.3d 1130.
To convict a defendant of possession of a controlled dangerous substance with intent to distribute, the state must prove beyond a reasonable doubt that he knowingly or intentionally possessed the contraband and that he 11?did so with the intent to distribute it. La. R.S. 40:966, 967; State v. Moore, 48,492 (La.App.2d Cir.11/20/13), 128 So.3d 608, writ denied 13-3003 (La.5/30/14), 140 So.3d 1175; State v. Cummings, 46,038 (La.App.2d Cir.1/26/11), 57 So.3d 499, writ denied 11-0341 (La.6/17/11), 63 So.3d 1037. It is not necessary for the state to prove that the defendant was in actual possession of the contraband; rather, proof of constructive possession is sufficient. State v. Moore, supra; State v. Cummings, supra. Constructive possession is shown when the state proves that the contraband was within the defendant’s dominion and control and that the defendant had knowledge of its presence. Id Factors which may be considered in determining whether the defendant exercised dominion and control sufficient to constitute constructive possession are his access to the area where the drugs were found and his physical proximity to the drugs. State v. Moore, supra.
When the specific intent to distribute a controlled dangerous substance is based on circumstantial evidence, the state must prove the amount of the substance, and/or that the manner in which it was carried was inconsistent with personal use. Intent to distribute illegal drugs may be established by proving circumstances surrounding the defendant’s possession which give rise to reasonable inferences of intent to distribute. State v. Moore, supra; State v. Cummings, supra. Five factors have been identified as useful in determining whether circumstantial evidence is sufficient to prove intent to distribute a controlled dangerous substance. The factors include: (1) whether the defendant ever distributed or attempted to distribute the controlled dangerous substances; (2) whether the drug was in a form usually associated with possession for distribution to others; (3) whether the amount of the drug 11screates an inference of an intent to distribute; (4) whether expert or other testimony established that the amount of drug found in the defendant’s possession is inconsistent with personal use; and (5) whether there was any paraphernalia, such as baggies or scales, evidencing an intent to distribute. State v. Moore, supra; State v. Cummings, supra; State v. Clark, *355 35,272 (La.App.2d Cir.12/5/01), 803 So.2d 280. Testimony of street value and dosage of the drug is also relevant to the issue of intent to distribute. State v. Stephens, 47,978 (La.App.2d Cir.5/29/13), 114 So.3d 1265, writ denied, 13-1551 (La.1/17/14), 130 So.3d 342; State v. Gladney, 29,791 (La.App.2d Cir.9/24/97), 700 So.2d 575.
La. C.E. art. 701 permits a law enforcement officer to express an opinion regarding matters of personal knowledge gained through experience, even if the witness is not first qualified as an expert. State v. Lewis, 48,373 (La.App.2d Cir.9/25/13), 125 So.3d 482; State v. Lowery, 609 So.2d 1125 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993).
When viewed in the light most favorable to the state, we find the evidence sufficient to support Manning’s convictions for possession with intent to distribute the subject controlled dangerous substances. Direct observation testimony from Chapman and Eppinette established Manning’s presence in and exit from the driver’s side of the vehicle with no other individual gaining access to the car after Manning’s exit during the late evening hours. Wright corroborated these facts. If believed, these eyewitness accounts were sufficient to exclude any reasonable probability that someone else placed the drugs in the car without Manning’s knowledge. Thus, the jury could have reasonably concluded that this evidence established beyond a reasonable doubt 114that Manning was the individual in the vehicle who had dominion and control over, and knowledge of, the drugs and contraband found in the vehicle.
Additionally, ample circumstantial evidence established Manning’s intent to distribute the drugs. Both Chapman and Johnson, the expert on distribution of street level narcotics, testified that the packaging of the drugs, lack of means to use or smoke the drugs and the presence of scales and the razor blade were all consistent with selling rather than personal use. Johnston’s testimony also established that the variety of drugs found in the car indicated sales and not personal use. His testimony further established that the lack of cash was not a determinate factor in whether drugs were being sold, because many distributors do ■ not carry money with them or Manning may have not yet made any sales.
This evidence was sufficient to establish beyond a reasonable doubt that Manning constructively possessed with intent to distribute the controlled dangerous substances found in the vehicle. This assignment of error is without merit.

Mistrial

Manning argues that the trial court erred in denying his motion for mistrial based on the district attorney’s “gang sign” gesture made in front of the jury during her questioning of LaTonya about her interaction with her brother while he was in the back of the patrol car. Manning argues that the gesture made by the district attorney with both hands was not inadvertent and was of such a duration that it drew the attention of defense counsel. He urges that such a gesture, despite the admonition, rendered it impossible for him to have a fair trial by an impartial jury.
11fiDuring the state’s questioning of La-Tonya, the witness was asked if she said anything to her brother while he was in the back of the patrol car. LaTonya testified she saw Manning in the back of the patrol car, but the officer told her she could not speak to him. At this point in the questioning, the district attorney asked LaTonya-if her brother made any gestures to her from the patrol car, such as shrugging his shoulders or holding his hands up. *356 The record indicates that the assistant district attorney actually shrugged her shoulders and made hand gestures with “both hands raised” with “the thumb, the index finger, and the pinky finger up” and the “two other fingers down, the middle finger and the ring finger down.” The defense objected and moved for a mandatory mistrial under La.C.Cr.P. art. 770, based on the alleged “throwing [of] gang symbols” by the assistant district attorney who stated that she did not “know that to be a gang sign. It’s not a gang thing.” The defense argued that the comment was an improper comment on race.
The jury was excused and a lengthy sidebar discussion ensued. The defense conceded that the gesture could represent any number of things, including a university symbol or the Latin Kings gang.[5] Manning argued that mistrial was warranted regardless of the assistant district attorney’s intent because her actions placed the idea of Manning flashing a gang gesture in the mind of the jury, thereby suggesting that he was a “gang banger.”
After hearing the argument of counsel, the trial judge denied the motion for mistrial, concluding that the acts of the assistant district attorney were not intentionally meant to convey a racial sign. Further, the court considered | lfiwhether the actions of the assistant district attorney inadvertently conveyed a racial comment to the jury. To that point, the court ruled as follows:
I’ve got to focus on what those twelve, in fact fourteen people now, would have taken it to be. Is it reasonable to — is it a reasonable conclusion to think that it’s very clear and obvious that it was a racial — she was trying to convey — even if she was trying to convey or not, that the message conveyed to this jury, whether intended or not, was a racial comment that Mr. Manning is a black man and is a gang member, is a gang banger, because of that. You convict him [ir]respective of what the evidence might show. So, back to this comment here, this, is what I’m going to do. Legal searches, this is what came up. It didn’t come up, though. Interestingly, it didn’t come up as a Latin King; although I found them and it said Latin King. This is the International Sign Language for I love you. So this signal, this picture is I love you.
[[Image here]]
So even though it’s possible that one of these fourteen people could have potentially conveyed that as a signal, as a Latin' King signal, I think it’s just as reasonable — more reasonable for them to conclude any of these others are even more likely — maybe not even seen Ms. Slaughter. This happened in maybe a second or two and her consistent demonstrative language. My expectations are they were likely focused on the witness. But even if they weren’t, this wasn’t something she did that brought attention to her. It was part of her common colloquialism in her speaking, non-verbally. As so, for all those reasons, the Court does not find that that comment was indirectly related to race. Certainly not directly. And I don’t find indirectly either. For that reason, the Court will deny the motion for a mistrial.
After further discussion with defense counsel, the court also determined that a reasonable conclusion was that in the full context of the situation, the gesture did not suggest that Manning was a member of a gang and would be subject to many interpretations. Therefore, with this rul *357 ing, the court admonished the jury to disregard any physical gestures on the part of the district attorney or defense counsel that they may have noticed during questioning.
Upon motion of a defendant, a mistrial shall be granted when a remark or comment, made within the hearing of the jury by the judge, district attorney, or 117a court official, during trial or in argument, refers directly or indirectly to race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury. Mistrial is warranted under Article 770 when certain remarks are considered so prejudicial and potentially damaging to a defendant’s rights that even jury admonition could not provide a cure. State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999). Mistrial is a drastic remedy, and the determination of whether the defendant has been prejudiced by the prosecutor’s statements lies within the sound discretion of the trial judge. State v. Hall, 48,125 (La.App.2d Cir.6/4/08), 986 So.2d 863, writ denied, 08-1511 (La.3/13/09), 5 So.3d 116; State v. Williams, 41,731 (La. App.2d Cir.1/24/07), 950 So.2d 126, writ denied, 07-0465 (La.11/2/07), 966 So.2d 599. Thus, a trial court’s ruling denying a mistrial will not be disturbed absent an abuse of discretion. State v. Givens, 99-3518 (La.1/17/01), 776 So.2d 443; State v. Carper, 47,409 (La.App.2d Cir.11/14/12), 107 So.2d 118, writ denied, 12-2706 (La.6/14/13), 118 So.3d 1079. Even if a mistrial is warranted under Article 770, the failure to grant a mistrial would not result in an automatic reversal of a defendant’s conviction, but would be a trial error subject to the harmless error analysis on appeal. State v. Givens, supra; State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. Trial error is harmless where the verdict rendered is “surely unattributable to the error.” State v. Johnson, supra; State v. Smith, 43,136 (La.App.2d Cir.4/23/08), 981 So.2d 200.
Manning concedes that there were no allegations or evidence showing his affiliation with a gang or gang-related activity. Moreover, he is not of the |18ethnic persuasion of the Latin Kings gang. The trial court’s determination that there was absolutely no intent on the part of the district attorney to inflame the jury is supported by his experience with the assistant district attorney and observation of the gesture. Moreover, the gesture in question was made following a question to Manning’s sister about whether Manning made any comment to her or communicated with her in any way from the backseat of the patrol car. Thus, as the trial court noted, there was no indication from the context of the situation which would relate the gesture to Manning’s participation in gang activity. Further, the alleged hand gesture was ambiguous.
Ultimately, the trial court’s admonition was neutral to both sides and effectively addressed any potential improper gestures during questioning of the witnesses. For these reasons, Manning has failed to demonstrate that he suffered such substantial prejudice to the extent that he was deprived of any reasonable expectation of a fair trial. We find no abuse of discretion in the trial court’s denial of Manning’s request for mistrial and determine this assignment of error to be without merit.

Excessive Sentence

Manning argues that 21-year sentences are excessive when considering that the drugs had a value of less than $1,000. He further argues that it was error for the trial judge to consider his pending charge of second degree murder in fashioning his sentences.
*358 Because Manning filed no motion to reconsider the imposed sentences, our review is limited to the bare claim of constitutional excessiveness.[6] State |19 v. Mims, 619 So.2d 1059 (La.1993); State v. Smith, 46,343 (La.App.2d Cir.6/22/11), 71 So.3d 485, unit denied, 11-1646 (La.1/13/12), 77 So.3d 950. Under constitutional review, a sentence can be excessive, even when it falls within statutory guidelines, if the punishment is so grossly disproportionate to the severity of the crime that it shocks the sense of justice and serves no purpose other than to inflict pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980); State v. Fatheree, 46,686 (La.App.2d Cir.11/2/11), 77 So.3d 1047.
The trial court has broád discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, an appellate court may not set aside a sentence as excessive. State v. Guzman, 99-1528, 99-1753 (La.5/16/00), 769 So.2d 1158; State v. June, 38,440 (La.App.2d Cir.5/12/04), 873 So.2d 939.
The penalty for possession with intent to distribute marijuana is 5 to 30 years at hard labor and a fine of not more than $50,000. La. R.S. 40:966(B)(3). The penalty for possession with intent to distribute methylenedioxymethcathinone, also Schedule I, is 5-30 years at hard labor, with at least 5 years to be served without benefits, and a fine of not more than $50,000. La. R.S. 40:966(B)(2). The penalty for possession with intent to distribute crack cocaine, Schedule II, is 2-30 years at hard labor, with the first 2 years to be served without benefits and an optional fine of not more than $50,000. La. R.S. 40:967(B)(4)(b).
|2oPrior to sentencing 36-year-old Manning, the trial judge expressly outlined Manning’s social and family history as well as the sentencing factors he considered. The court determined that Manning was actually a fifth felony offender. The judge considered the presentence investigation report, which reflected prior and additional drug charges. Specifically, the court noted Manning’s 1996 conviction for unauthorized use of a movable, for which he received a suspended 5-year hard labor sentence and had his probation revoked in 2002. In 2001, Manning had an out-of-state guilty plea to tampering/fabricating evidence,-assault on a public servant, and attempting to take a weapon from a peace office. The court observed “many other misdemeanor arrests” between these earlier offenses and Manning’s second conviction for attempted unauthorized use of a motor vehicle, and for possession of cocaine. in 2003. Additionally, the court noted Manning’s second degree battery conviction from 2009, pending murder charge and arrest warrants for drug charges for which a $1,000,000 bond had been set. The court specifically considered Manning’s criminal history as aggravating factors and noted as the only mitigating factor that Manning’s incarceration would cause a hardship on his family.[7]
*359 For the offenses of conviction, Manning faced potential sentencing exposure of 90 years. The present offenses involved serious crimes against society and served to qualify Manning as a fifth felony offender due to his consistent criminal activity since his late teenage years. His record includes prior drug offenses and crimes of violence against police officers and others. Manning has obviously failed to benefit from prior leniency afforded to him in | ⅞1 sentencing, demonstrated by his continued pattern of disregard for the law. Considering his criminal history and the seriousness of the present offenses, we find the imposed upper midrange sentences to be appropriately tailored to this defendant and do not shock the sense of justice. Accordingly, we find that this assignment of error is without merit.

Conclusion

For the foregoing reasons, Manning’s convictions and sentences are affirmed.
AFFIRMED.

. From the events, Manning was also charged and convicted of misdemeanor possession of drug paraphernalia. The trial court sentenced him to a concurrent 6-month sentence. Neither this conviction nor sentence has been appealed.

. On May 29, 2014, Manning filed a pro se motion for judgment of acquittal, contesting the sufficiency of the evidence to convict. The trial court denied the motion in open court at the sentencing hearing held on the same day.

. Manning was charged with the technical name of this type of ecstasy, methylenedioxy-methcathinone, a substituted Cathinone.

. The state filed an habitual offender bill seeking Manning’s adjudication as a fifth felony offender based on four prior felonies including unauthorized use of a movable, attempted unauthorized use of a motor vehicle, possession of cocaine and tampering with evidence (a Texas conviction). On this record, there is no record of an adjudication on the habitual offender bill.

. Latin Kings is a Puerto Rican and Hispanic gang established in-Chicago.

. This precludes our review of the issue of the trial court consideration of Manning’s alleged pending murder charge. Nevertheless, all convictions and prior criminal activity (including arrests and pending charges) are proper sentencing considerations. State v. Platt, 43,708 (La.App.2d Cir. 12/3/08), 998 So.2d 864, writ denied, 09-0265 (La. 11/6/09), 21 So.3d 305; State v. Russell, 40,526 (La. App.2d Cir. 1/27/05), 920 So.2d 866, writ denied, 06-0478 (La.9/29/06), 937 So.2d 851. Thus, the judge properly considered that charge in fashioning the sentences.

. Manning was the father of day old and eighteen-month-old daughters.