Judgment rendered April 22, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,465-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

CHEREKITA Y. MOREHEAD                        Appellant

* * * * *

Appealed from the
Thirty-Seventh Judicial District Court for the
Parish of Caldwell, Louisiana
Trial Court No. 95,919

Honorable Ashley P. Thomas, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Sherry Watters

BRIAN E. FRAZIER                       Counsel for Appellee
District Attorney

CHARLES L. COOK
Assistant District Attorney

* * * * *

Before PITMAN, COX, and THOMPSON, JJ.

**THOMPSON, J.**

This is an appeal by defendant, Cherekita Morehead, of her manslaughter conviction (in violation of La. R.S. 14:31), her 25 year sentence, and her conviction by less than a unanimous jury which arises from the 37th Judicial District Court, Parish of Caldwell, the Honorable Ashley Paul Thomas presiding. For the following reasons, defendant's conviction and sentence are affirmed. Defendant asserts three assignments of error.

### FACTS & PROCCEDURAL HISTORY

The defendant, Cherekita Morehead (hereinafter "Defendant"), was indicted for the second-degree murder of Eugene Brown ("Eugene"), in violation of La. R.S. 14:30.1. The couple had been dating for two to three years at the time of Eugene's death, and were living together in West Monroe, Louisiana. Eugene died of a single gunshot wound to the head in Columbia, Caldwell Parish, Louisiana, which Defendant argues was an accidental shooting.

On November 23, 2017, a family gathering was held in Columbia, Louisiana, at the home of James Brown ("James"), a relative of Eugene. Defendant and Eugene were driven from West Monroe to the gathering at James's residence in Columbia by Oshay Roberts. At the gathering at James's residence, testimony established there was eating, drinking, and smoking of marijuana.

Demarius Douglas ("Demarius") was also at the gathering. Demarius testified that after having been at the gathering for three or four hours he wanted to go to a friend's house, who also lived in Columbia. Demarius was too intoxicated to drive himself, so Eugene drove him to the Andings

Heights Projects in Demarius' Dodge Avenger. Eugene dropped off Demarius at the first apartment and continued to drive to the residence of Demarius' step-sister, Paris Craft ("Craft"), whose apartment was also located in Andings Heights Projects. Somewhere along the way Eugene apparently picked up Derrick Coleman ("Coleman") who accompanied Eugene to the apartment of Craft.

Defendant testified that Oshay (their ride back to West Monroe) was ready to return to West Monroe before Eugene returned to James's house, but she did not want to leave without Eugene. Another gathering attendee, DaShaun Roberts (hereinafter "DaShaun"), testified that he arrived at James's house after Demarius and Eugene left, but that Defendant was still there. DaShaun stated that, after spending some time with his family, he "got a call to bring [Defendant] to the Projects," but could not remember who called him. DaShaun testified that Defendant was "very upset" during the drive to the Anding Heights Projects because Eugene had left her at James's house. DaShaun informed Defendant that he would not give Eugene and her a ride back to James's together because she was upset with Eugene. Defendant testified that she was frustrated because their possible ride back to West Monroe may have left without them, but denied that she was angry with Eugene.

DaShaun testified that he parked at Craft's apartment and, within two minutes, Eugene and Coleman arrived in Demarius' vehicle. DaShaun and Defendant exited their vehicle and Defendant began "picking" with Eugene, opening his car door and putting her hands in his face. Defendant testified that she merely reminded Eugene that he should not be drinking and driving, and that they might have missed their ride home, but again denied that she

2

was angry. Everyone went inside Craft's apartment and smoked marijuana. DaShaun testified that Eugene and Defendant continued arguing, with Defendant "slapping [Eugene] upside the head" at one point. Defendant denied arguing with Eugene or striking him.

A while later Oshay, who was to drive Defendant and Eugene back to West Monroe, arrived at Craft's apartment, and Defendant retrieved her purse from DaShaun's vehicle and placed it in Oshay's vehicle, apparently in preparation for the drive back to West Monroe. DaShaun testified that Eugene then left in Demarius' vehicle to go back to the apartment where he had earlier dropped off Demarius. Eugene would not allow Defendant to accompany him to the apartment. Defendant testified that Oshay became aggravated because he was ready to leave Columbia and go back to West Monroe. DaShaun stated that Defendant then retrieved her purse from Oshay's vehicle and "stormed off down the street," saying, "don't be mad when something happens, or something like that." Defendant testified that she left Craft's apartment to find Eugene because she did not want to leave Columbia and go back to West Monroe without him.

Defendant testified that, while looking for Eugene, she removed her gun from her purse because she heard dogs barking and was scared. She stated that she had purchased the gun for Eugene's birthday in August 2017 and that Eugene had picked it out. On cross examination, Defendant admitted that, shortly after the shooting, she told investigators that she purchased the gun for her own protection. Defendant testified that Eugene was aware that she had the gun in her purse on the day of the shooting. She stated that she and Eugene had handled the gun earlier in the day, while they were at James's house.

3

Defendant stated that, when she was walking, she located Demarius' vehicle parked in front of the other apartment. She testified Eugene was still in the driver's seat of the vehicle and that she knocked on the passenger side window, and Eugene then partially rolled down that window. Defendant testified that Eugene did not unlock the car door, so she leaned in to unlock the door with her left hand and the gun, held in her right hand, discharged. She believed that Eugene saw the gun. Defendant testified that she had no prior experience with firearms and did not know that the safety was off. She maintained that she did not intend to shoot Eugene, but that the gun accidentally discharged.

Defendant testified that immediately after the gun discharged that she went to the driver's side of the vehicle and opened the door. She further testified that she blew the horn and screamed for help. Eugene was allegedly on the phone with Coleman when Defendant arrived at the passenger side of the vehicle. Coleman apparently could not be located to testify at the trial. DaShaun testified that he was standing next to Coleman while Coleman was on the phone with Eugene, and that Coleman said Defendant and Eugene were fighting. Coleman asked Oshay to go to the apartment where Eugene and Defendant were outside because they were fighting.

Demarius, who was inside the apartment nearest to the vehicle when the shooting occurred, testified that, approximately 35 to 45 minutes after Eugene dropped him off, he heard a car honking. He claimed when he walked to the door of the apartment that he heard Defendant screaming, "I didn't mean to," repeatedly. Demarius stated that, as he approached the vehicle, Defendant told him that she had shot Eugene. He saw Defendant sit

4

in Eugene's lap and try to wake him. Defendant testified that she walked towards the apartment that Demarius exited and told him that the gun had gone off. Demarius, a convicted felon, testified that he instructed Defendant to hide the gun because he was afraid to have the gun found in his vehicle. Defendant testified that she moved the gun as instructed.

A resident of the Andings Heights Projects heard the commotion the night of the shooting. Dolphus Bouie (hereinafter "Bouie") testified that he was at home on the night of November 23, 2017, when he heard a gunshot, then a horn blaring and screaming. Bouie walked outside and saw a man and a woman inside the vehicle. He testified that he heard the woman say that she killed her boyfriend and that she did not mean to do it. Bouie observed the woman pick a gun up from the ground on the passenger side of the vehicle and walk away with it. At this point, Eugene was mortally wounded in the vehicle from being shot by Defendant. The police began to arrive a short time later.

Deputy Tammy Reed ("Deputy Reed") of the Caldwell Parish Sheriff's Office ("CPSO"), responded to the scene of the shooting and testified that she was approached by Defendant when she arrived on scene. Deputy Reed testified that Defendant admitted to shooting Eugene.

CPSO Investigator Tony Childress ("Investigator Childress") testified that he inspected the Dodge Avenger in which Eugene was shot at the scene. He stated that the passenger window was approximately halfway down and that there was no damage to the window or door. Investigator Childress determined, based on his investigation, that Eugene was seated in the driver's seat and Defendant was located on the passenger side of the vehicle when the shooting occurred.

CPSO Detective Hank Boyles, testified that he collected the gun used in the shooting, a .380 semi-automatic pistol, from behind the apartment building. A spent casing was jammed in the working mechanism of the gun, indicating that the gun had been fired once, but could not be fired again because of the jammed casing. The gun was provided to the Louisiana Crime Lab to be tested for any mechanical failures. Kendall Stracener, of the North Louisiana Crime Lab, testified that he examined the gun used in this shooting and found no mechanical defects during four test firings. He testified that the gun had a trigger pull of 8.2 pounds, which was slightly on the lower end of the normal range.

Ronald Scott, an independent forensic consultant hired by the defense, testified that he had inspected the gun used in this shooting. He testified that the safety was operable and that the trigger pull was within factory specifications. Scott did not test fire the gun, but testified that he found no defects during his examination. He explained that a bullet casing could become jammed in the working mechanism of the gun if the weapon is held firmly when fired. He further testified that Defendant could have unintentionally discharged the gun when she reached into the car to unlock the door with her left hand if the finger of her right hand was on the trigger due to a "sympathetic squeeze," which is an automatic response of one hand based upon what the other hand is doing. However, he was unable to state whether Defendant fired the gun intentionally or unintentionally.

Dr. Frank Peretti, associate medical examiner and forensic pathologist for the territory including Caldwell Parish, Louisiana, testified that he conducted the autopsy of Eugene. Dr. Peretti testified that there was a gunshot wound to the hairline of Eugene's right forehead, and that the bullet

6

had a left, backward, and downward trajectory. Dr. Peretti explained that he identified stippling on Eugene's skin around the wound, classifying the wound as an intermediate gunshot wound fired from no more than 24 inches away from Eugene. Dr. Peretti testified that his examination and findings did not support the position that this was an accidental shooting.

Defendant's jury trial commenced on May 21, 2019, and on May 24, 2019, the jury returned a verdict of guilty of manslaughter by a vote of 10-2. A presentence investigation was ordered. On August 13, 2019, Defendant was sentenced to 25 years' imprisonment at hard labor. A motion to reconsider sentence was denied. This appeal followed.

## DISCUSSION

**Assignment of Error No. One**: The State failed to prove the charge of second-degree murder or manslaughter beyond a reasonable doubt. In the light most favorable to the prosecution, at best, the evidence supports that an accident happened, the conviction should be vacated and an acquittal ordered. Alternatively, only the lesser verdict of negligent homicide can be entered.

On review, the defendant asserts that, when viewed in a light most favorable to the state, the evidence supports a verdict of not guilty or of negligent homicide because she lacked the specific intent required for a conviction for manslaughter. Defendant asserts that her lack of intent was shown through testimony regarding her lack of any disputes with Eugene, and the fact that she immediately took responsibility for the shooting and sought help. She argues that the return of a lesser verdict showed that the jury found that she did not intend to harm Eugene and that the state failed to prove that she had any motive to harm Eugene. Defendant further asserts that the evidence clearly showed that the shooting was an accident, noting

7

her reasonable belief the gun was unloaded and that the safety was on when she reached into the car to unlock the door.

In response, the state asserts that the testimony and evidence presented was sufficient to sustain a conviction for manslaughter, and that the jury reasonably rejected Defendant's hypothesis of innocence. The state notes that DaShaun Roberts testified that Defendant was very upset with Eugene prior to the shooting, and that the two had been arguing before Defendant retrieved her purse and gun to seek out Eugene. The state asserts the expert testimony showed that Eugene had been shot with a gun that had been placed within 24 inches of his head through a partially opened car window, that the entry wound was not consistent with a wound caused by an accidental shooting, and that the gun had no mechanical defects that would cause an accidental misfire.

*Applicable Law*

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 05/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Bass*, 51,411 (La. App. 2 Cir. 06/21/17), 223 So. 3d 1242, *writ not cons.*, 18-0296 (La. 04/16/18), 239 So. 3d 830. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 02/22/06), 922 So. 2d 517; *State v. Dotie*,

8

43,819 (La. App. 2 Cir. 01/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/06/09), 21 So. 3d 297, 12-0717 (La. 09/12/12), 98 So. 3d 305.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 01/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 50,643 (La. App. 2 Cir. 06/22/16), 197 So. 3d 717, *writ denied*, 16-1479 (La. 05/19/17), 221 So. 3d 78; *State v. Gullette*, 43,032 (La. App. 2 Cir. 02/13/08), 975 So. 2d 753. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Green*, 49,741 (La. App. 2 Cir. 04/15/15), 164 So. 3d 331.

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. *Id.* When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Lilly*, *supra*; *State v. Green*, *supra*.

The trier of fact is charged with weighing the credibility of this evidence and, on review, the same standard as in *Jackson v. Virginia* is

applied, giving great deference to the fact finder's conclusions. *State v. Green*, *supra*. When the trier of fact reasonably rejects the hypothesis of innocence advanced by a defendant, the hypothesis fails, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. *State v. Sosa*, 05–0213 (La. 01/19/06), 921 So. 2d 94; *State v. Captville*, 82–2206 (La. 1984), 448 So. 2d 676.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Green*, *supra*; *State v. Glover*, 47,311 (La. App. 2 Cir. 10/10/12), 106 So. 3d 129, *writ denied*, 12–2667 (La. 05/24/13), 116 So. 3d 659. Such testimony alone is sufficient even where the state does not introduce medical, scientific or physical evidence. *State v. Larkins*, 51,540 (La. App. 2 Cir. 09/27/17), 243 So. 3d 1220, *writ denied*, 17-1900 (La. 09/28/18), 253 So. 3d 154. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. *State v. Casey*, *supra*.

La. R.S. 14:31 provides, in pertinent part, that manslaughter is:

A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

*Application of Law to Facts*

In this case, the evidence was sufficient to support the jury's finding that Defendant committed manslaughter. Testimony showed a reasonable probability that the shooting was not accidental. Although Defendant testified that she and Eugene had not argued on the day of the shooting, DaShaun Roberts testified that Defendant was angry with Eugene because he left her at James's house. DaShaun described Defendant as "picking at [Eugene]" and striking him once she arrived at the Andings Heights Projects. Testimony indicated that Defendant continued to be upset when Eugene again left her to return Demarius' car. At that point Defendant retrieved her purse containing the gun from the vehicle that she was supposed to ride to West Monroe in and went searching for Eugene. DaShaun testified that Derrick Coleman, who was on the phone with Eugene when he was shot, stated that Defendant and Eugene were fighting just prior to the shooting.

Although the defense asserted the theory that the gun accidentally discharged, the jury clearly found the expert testimony regarding the lack of mechanical defects to be credible and discounted Defendant's testimony that she did not intend to fire the gun. Both experts, Det. Hank Boyles and Ronald Scott, testified that the gun had no mechanical defects. Scott, Defendant's own expert, was unable to state whether the shooting was unintentional. Dr. Peretti testified that the gun was within 24 inches of Eugene when it was fired, indicating that Defendant's arm was extended into the vehicle when the gun was fired and that the shooting was not accidental.

Ultimately, it was the jury's decision, as fact-finder, to assess the credibility of the witnesses and to weigh the evidence. The trier of fact

11

weighed the evidence and concluded there was proof beyond a reasonable doubt that Defendant committed manslaughter. Under these circumstances, the jury's decision should not be disturbed on appeal. Therefore, this assignment of error is without merit.

**Assignment of Error No. Two**: The trial court erred in declaring a legal verdict where the verdict was not unanimous. A non-unanimous verdict violates due process and cannot support a conviction.

On review, the defendant argues that the non-unanimous verdict eased the State's burden and allowed a conviction on evidence that did not meet the burden of proof required or establish all of the necessary elements. Defendant further argues that a conviction based upon a non-unanimous verdict does not satisfy due process requirements.

In response, the state argues that the constitutionality of La. C. Cr. P. art. 782 may not be considered by this Court because it was not properly raised in the trial court below. The state further argues that the Louisiana Supreme Court has previously rejected the arguments set forth by Defendant and that La. C. Cr. P. art. 782 is constitutional.

*Applicable Law*

Under the jurisprudence applicable to this case, non-unanimous jury verdicts are constitutional and do not violate a defendant's equal protection rights. The recent amendments to La. Const. art. I, § 17 and La. C. Cr. P. art. 782, which now require unanimous verdicts in felony cases, would not apply to Defendant's case as the amendments apply prospectively only to offenses committed on or after January 1, 2019. The United States Supreme Court granted a writ of *certiorari* in *Ramos v. Louisiana*, No. 18-5924, 2019 WL 1231752, (U.S. Mar. 18, 2019). In that case, the Court will address the

12

issue of whether the Fourteenth Amendment fully incorporates the Sixth Amendment guarantee of a unanimous verdict.

*Application of Law to Facts*

Unless and until the United States Supreme Court finds Louisiana's prior non-unanimous jury law to be retroactively unconstitutional and applicable to this case, Defendant has failed to meet her burden to prove that she is entitled to relief. For the foregoing reasons, this assignment of error is without merit.

**Assignment of Error No. Three**: The district court abused its discretion in imposing a twenty-five-year sentence on the first offender, and in denying the Motion to Reconsider. It is constitutionally excessive under the circumstances of this offense and this offender.

The Defendant argues that a sentence of 25 years' imprisonment for a 23-year-old first offender convicted of manslaughter is constitutionally excessive given the circumstances of this case. She argues that the trial court abused its discretion by imposing a sentence that is on the upper end of the applicable sentencing range. Defendant asserts that the offense was partially the product of her youth and a lack of knowledge of gun safety, such that the offense is unlikely to occur again. Defendant notes that she has taken responsibility for her actions and shown remorse.

In response, the state argues that Defendant's sentence of 25 years' imprisonment is not constitutionally excessive under the facts and circumstances of this case. The state notes that the trial court considered all mitigating factors, including Defendant's single prior misdemeanor conviction and employment history. The state argues that the jury's verdict indicates a belief that Defendant intended to kill Eugene. The state argues

13

that, based upon the circumstances of this case, any lesser sentence would deprecate the seriousness of the offense.

*Applicable Law*

Appellate courts apply a two-pronged test when reviewing a sentence for excessiveness: (1) whether the trial court adequately considered the guidelines established in La. C. Cr. P. art. 894.1; and (2) whether the sentence is constitutionally excessive. *State v. Gardner*, 46,688 (La. App. 2 Cir. 11/2/11), 77 So. 3d 1052.

The court must first determine whether the record shows that the trial court took cognizance of the criteria set forth in La. C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. DeBerry*, 50,501 (La. App. 2 Cir. 04/13/16), 194 So. 3d 657, *writ denied*, 16-0959 (La. 05/01/17), 219 So. 3d 332. Articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. *State v. Lanclos*, 419 So. 2d 475 (La. 1982); *State v. DeBerry*, *supra*.

The trial judge is given wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed should not be set aside as excessive in the absence of a manifest abuse of his discretion. *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7; *State v. Diaz*, 46,750 (La. App. 2 Cir. 12/14/11), 81 So. 3d 228. On review, an appellate court does not

14

determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Williams*, supra; *State v. Free*, 46,894 (La. App. 2 Cir. 01/25/12), 86 So. 3d 29.

Second, this court must determine whether the sentence is constitutionally excessive. A sentence can be constitutionally excessive, even when it falls within statutory guidelines if: (1) the punishment is so grossly disproportionate to the severity of the crime that, when viewed in light of the harm done to society, it shocks the sense of justice; or (2) it serves no purpose other than to needlessly inflict pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bonanno*, 384 So. 2d 355 (La. 1980); *State v. Weaver*, 01-0467 (La. 01/15/02), 805 So. 2d 166; *State v. DeBerry*, *supra*.

Whoever commits manslaughter shall be imprisoned at hard labor for not more than 40 years. La. R.S. 14:31(B). Whoever commits second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1.

***Application of Law to Facts***

Following review of the pre-sentence investigation report, the trial court sentenced Defendant to 25 years' imprisonment at hard labor. Because Defendant was charged with second-degree murder, she was exposed to a potential life sentence. Her conviction for the lesser offense of manslaughter carries a maximum sentence of 40 years' imprisonment, so the sentence of 22 years' imprisonment is a mid-range sentence and she received a significant benefit from the jury's verdict.

The trial court considered the pre-sentence investigation, which included a statement from Defendant, from the mother of Eugene, and from

a friend of Defendant. The trial court specifically noted that Defendant was a first felony offender, with no significant criminal history, and that she was employed at the time of the offense. The trial court further noted that Defendant continued to maintain that the shooting was accidental, despite the jury's verdict.

Based upon the facts of this case, the fact that a firearm was used in the commission of the offense, the severity of the injuries sustained by Eugene, and in light of the harm done to Eugene's family, the sentence imposed does not shock the sense of justice, nor is it grossly disproportionate to the offense for which Defendant was convicted. The trial court was within its discretion in imposing the sentence, which is not excessive. For the foregoing reasons, this assignment of error is without merit.

## CONCLUSION

For the aforementioned reasons, the defendant's conviction and sentence are affirmed.