Judgment rendered December 17, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,621-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                                    Appellee

versus

LAQUINTON ECKLES                                    Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 390,096

Honorable Donald Edgar Hathaway, Jr., Judge

* * * * *

LOUISIANA APPEALS AND WRIT                 Counsel for Appellant
SERVICE
By: Christopher Albert Aberle

LAQUINTON ECKLES                                        Pro Se

JAMES E. STEWART, SR.                      Counsel for Appellee
District Attorney

ERIC MATTHEW WHITEHEAD
ASHLIN NICOLE THOMAS
Assistant District Attorneys

* * * * *

Before STONE, STEPHENS, and ROBINSON, JJ.

**ROBINSON, J.**

Having been convicted by a jury of molestation of a juvenile and indecent behavior with juveniles, Laquinton Eckles appeals his convictions and sentences. For the following reasons, we affirm his convictions and sentences, and remand for a correction of the minutes.

## FACTS

Eckles and Ko'rese Clay attended the same high school and later worked together. Clay became pregnant with Eckles's child after a brief relationship. The child, S.L., was born extremely premature on January 25, 2007. S.L. suffered multiple strokes and bleeding on the brain while she was a newborn. She was six months old before she was released from the hospital. She was diagnosed with cognitive developmental delay and has grand mal seizures, cerebral palsy, and learning issues. She has received at-home counseling three to four times a week for five years.

Eckles found out that S.L. was his daughter in 2009. He had scant contact with S.L. until Easter Sunday, 2022. On that day, Clay left S.L. with him for a few hours. At the beginning of May, Clay allowed S.L. to spend a night with Eckles and his girlfriend. On Mother's Day in 2022, Eckles went to Clay's house with his girlfriend and son. Eckles left with S.L. and promised to return her by 9:00 p.m., but did not return home until after midnight.

The following day, S.L. asked her mother if she could buy her razors to shave her private area. Clay, who was alarmed by this request, contacted S.L.'s counselor and asked her to speak with S.L.

The counselor, Mackisha Brumant, met with S.L. that day. S.L. told her that she had spent the weekend with her father, he made her feel

uncomfortable by discussing sex with her, she touched his private parts, and he smelled her private parts. S.L. also had journal entries about the incident.

Brumant disclosed the allegations to the Department of Children and Family Services ("DCFS") and to Clay. The Shreveport Police Department ("SPD") began an investigation and S.L. was interviewed at the Gingerbread House Children's Advocacy Center.

Jordan Hughes conducted the interview at the Gingerbread House. Hughes began by asking S.L. about her home life. S.L. replied that she hated her mother and stepfather, it was terrible to live with them, and her mom and father did "weird ass shit" like having sex. S.L. told Hughes that her father (Eckles) had talked to her about sex and made a move on her on Mother's Day. S.L. stated that they went to his sister's apartment in Shreveport after he left his girlfriend and his son. Eckles did cocaine in front of her there. She and Eckles were the only people at the apartment. He later told her that he wanted to sniff cocaine off her butt.

She told Hughes that while they were in the kitchen, Eckles asked her for a hug, then he lifted her shirt and removed her bra. He touched her breasts. She told him to stop and went to a couch in the living room. Eckles followed her, pulled down his pants, and started rubbing his penis. He asked S.L. if she felt wet, then grabbed her hand and forced her to touch his penis.

When she wanted to watch anime, he told her to search for anime pornography. She viewed girls making out. While she was standing in front of Eckles, he pulled down her pants and panties and sniffed her vagina. She thought he was trying to insert his penis in her. She asked to go home.

On the way home, they stopped at a Whataburger restaurant. She told Hughes that Eckles pulled out his penis and asked her if she wanted to see

2

where the "white stuff" came from. He began rubbing on his penis and she saw a little "white stuff." He took her home from Whataburger.

Hughes presented two pages of journal entries written by S.L. and had S.L. read them aloud. She had written that on last Saturday, her dad touched her down there and he took her bra off, he kept touching her and feeling on her butt, and it was a weird thing to talk about sex. Hughes questioned her about her writing that her dad had touched her down there. When Hughes asked where her dad put his hand, she pointed to her pelvic region and said he started to feel around. She also said his hand went inside her down there.

Eckles was charged by an amended bill of information with one count of molestation of a juvenile in violation of La. R.S. 14:81.2(B)(2) and with one count of indecent behavior with juveniles in violation of La. R.S. 14:81(A)(1). On the first count, it was alleged that he had committed multiple lewd or lascivious acts upon the person or in the presence of S.L., his 15-year-old daughter. On the second count, it was alleged that he had made S.L. watch pornography in his presence, sniffed S.L.'s vagina, and asked S.L. if he could sniff cocaine off her butt.

A trial was held on January 28, 2025. Clay recounted the difficulties of S.L.'s birth and the lingering effects. Clay testified that Eckles was not involved in S.L.'s life. She would reach out to him on social media about events in S.L.'s life, but he might not respond for several months.

Clay saw Eckles while driving through Mansfield on Easter Sunday in 2022, so she stopped briefly to speak with him. She allowed Eckles to take S.L., and he returned her to Shreveport within an hour as he had promised. He was with a female and his son at the time. A few weeks later, she called Eckles concerning S.L. He kept S.L. overnight on that weekend.

3

Mother's Day weekend was the next weekend. Eckles came to her house at around 5:00 p.m. After she and her husband spoke with Eckles for a couple of hours, Eckles left with S.L. at around 7:00 p.m. with the understanding that he was to return her by 9:00 p.m. Eckles said they would get S.L.'s hair braided, visit his mother, and then return. Clay described her efforts to reach Eckles by telephone, text messages, and social media when he did not return S.L. as promised. Eckles returned S.L. after midnight. Clay found S.L. to be quiet when she returned home, but Clay's attention was focused more on getting Eckles to explain what had happened.

Clay testified that when she brought S.L. to school that Monday morning, S.L. asked for razors to shave her private area. Clay was alarmed by this, so she called S.L.'s counselor and asked if she would speak to S.L. about what had happened with Eckles and why S.L. was suddenly interested in shaving. That Friday, Clay learned what had occurred.

Clay testified that she told workers from DCFS that S.L. has trouble formulating sentences or getting her thoughts together when she becomes riled up.

Mackisha Brumant was S.L.'s behavioral health counselor. She testified that after she explored the matter with S.L. to obtain further details, she reported the abuse to her supervisor. Her supervisor told her to make a mandatory report to DCFS, which she did on Friday. She also told S.L.'s mother.

Jordan Hughes conducted interviews at the Gingerbread House. She testified as an expert in the field of forensic interviewing. A detective observed S.L.'s interview from another room, but she could not recall if he

4

communicated with her during the interview. The video of the interview was played while she was on the witness stand.

Hughes noticed that S.L. would often change the conversation while in the middle of a disclosure, but added that it was normal for a child to deflect while disclosing abuse. Hughes was presented with two pages of journal entries and testified about the content of what was disclosed by S.L.

Hughes testified that when S.L. mentioned that her mother and stepfather engaged in weird behavior, S.L. referred to sex before disclosing Eckles's sexual abuse of her. Hughes did not want to interrupt her in the middle of her disclosure. Hughes testified that while she had to bring S.L. back to their conversation many times because she deflected a lot during the interview, she thought S.L. responded to her questions in an appropriate manner and was able to keep a conversation with her.

David Karam was an investigator with SPD's sex crimes division. He was assigned the case on May 26, 2022, after it was reported on May 14, 2022. Karam set up and observed the interview at the Gingerbread House. He asked Hughes to question S.L. in greater detail about the cocaine use and about Eckles touching her vagina. After the interview, he spoke with Clay, and then he obtained an arrest warrant. He testified that Eckles's date of birth is May 12, 1986.

Corporal Emmett Gafford was a patrol officer with SPD. He was dispatched to a sexual assault call on May 14, 2022. Clay told him that she had read S.L.'s journals and discovered that S.L.'s father had touched her inappropriately. He then contacted the sex crimes division.

S.L. testified that she was born on January 25 and was 18 at the time of trial. She identified her journal pages. She denied that her stepfather

touched her in any way. She testified that she disliked her stepfather and that her mother was often mad.

Sgt. John Madjerick from SPD testified as an expert in fingerprint examination and identification. He compared Eckles's thumbprints taken in court with the thumbprints on a fingerprint sheet attached to a bill of information from DeSoto Parish charging Eckles in 2006 with carnal knowledge of a juvenile. Madjerick determined that the thumbprints were from the same person. The earlier crime occurred on October 14, 2005, when Eckles would have been 19. Eckles pled guilty as charged in DeSoto Parish, and he received a hard labor sentence of two years. The sentence was suspended with a probation condition of two years.

Sherry Williams is S.L.'s maternal grandmother. She described S.L. as being well cared for. She testified that there had been proceedings in juvenile court concerning custody of Clay's daughters, but not of S.L. She testified that when S.L. lashed out in a rage and wondered how a father could do that to his daughter, she asked S.L. if Eckles had done something to her, and S.L. responded in the affirmative. Eckles's mother had asked her if she believed S.L., and she said yes.

Tara Eckles is Eckles's mother. She testified that the victim in the carnal knowledge case was 16 or 17 when Eckles's son was born. They were dating when she became pregnant. She was not aware that her son had any alcohol or drug problems. She testified that in 2018 or 2019, Clay told her to go to juvenile court because she was going to turn over custody of S.L. to Eckles before the state took custody of S.L., but nothing came of it.

Jessica Eckles is defendant's sister. She testified that she has not personally seen her brother use drugs or alcohol. She thought there was an

6

age difference of six months to a year between her brother and the mother of his son. She testified that she never gave her brother access to her apartment without her being there.

Jermaine Williams has been friends with Eckles since third grade. He testified that Eckles had been in a dating relationship with the victim in the carnal knowledge case. Eckles lived with him and his six nieces, and then later with him and his daughter. Williams testified that Eckles sometimes babysat his daughter. He described Eckles as protective of children, and he stated that he never witnessed Eckles act inappropriately around children.

Williams testified that Clay was very vindictive because she never got over her romantic interest in Eckles. He also testified that Clay placed conditions on Eckles to see S.L., such as giving her money.

Williams recalled when Clay dropped S.L. off at his house for Eckles to see her. This was in April of 2022. He described Clay as being angry at the time, and that S.L. had body odor and looked unkempt. He did not know Clay as being very truthful.

Eckles testified on his own behalf. Until Easter Sunday in 2022, his relationship with S.L. was limited to phone calls and text messages. He explained that the victim in the carnal knowledge case was his girlfriend who was a grade behind him in high school.

Eckles testified that Clay pulled up at his friend's house that Easter Sunday and left S.L. with him. Clay told him that she did not want custody of S.L., but he knew that he could not have custody of her because of his conviction. He testified that he went to court in January of 2022 when Clay's mother alleged neglect and was seeking custody of S.L.

Eckles testified that S.L. had an odor on Easter Sunday, so he gave some money to his girlfriend and asked her to take S.L. to the store to get some hygiene products. They also took S.L. to his sister for her to braid S.L.'s hair.

Eckles testified that the second visit was around May 1. He and his girlfriend picked S.L. up from school and brought her to their home in Nacogdoches, Texas. S.L. spent the night with them before being returned home the next day.

Eckles testified that Clay called him on Mother's Day and asked him to get S.L. since he was in Shreveport. He arrived at Clay's house at around 6:45 p.m. He left the house at about 8:45. He testified that he told Clay that he would return S.L. after going to a fair. He stated that his girlfriend, her daughter, and his young son were with him.

Eckles testified that his date of birth is May 12, 1986. He acknowledged that S.L. was in his care when she was with him during her three visits.

Angelina Pablo was Eckles's girlfriend in 2022. She testified that S.L. acted like she wanted to be around Eckles and stated that she wanted to live with him.

The jury found Eckles guilty as charged on both counts. Eckles filed a motion for new trial and a motion for post verdict judgment of acquittal. Both motions were denied.

Sentencing was held on February 19, 2025. Eckles, his mother, and his sister testified briefly. The court asked Eckles about his work history and family life.

Reviewing the La. C. Cr. P. art. 894.1 sentencing guidelines, the trial court concluded: (1) there was an undue risk that during the period of a suspended sentence or probation that Eckles would commit another crime; (2) Eckles was in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution; and (3) a lesser sentence will deprecate the seriousness of Eckles's crime. Regarding aggravating factors, the court concluded: (1) Eckles's conduct during the commission of the offense manifested deliberate cruelty to the victim; (2) Eckles used his position or status to facilitate the commission of the offenses; and (3) the offenses resulted in a significant permanent injury to the victim. The court found no mitigating factors.

Eckles was sentenced to 10 years at hard labor for his molestation of a juvenile conviction. The court stated it was going to sentence him to 15 years at hard labor before it heard the statements from Eckles and his family members. Eckles was sentenced to five years for his indecent behavior with juveniles conviction. The sentences were to run consecutively. Any fines, costs, and fees were waived.

## DISCUSSION

### *Sufficiency of the evidence*

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La.

9

C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Green*, 49,741 (La. App. 2 Cir. 4/15/15), 164 So. 3d 331. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156.

The *Jackson* standard of review is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Hampton*, 52,403 (La. App. 2 Cir. 11/14/18), 261 So. 3d 993, *writ denied*, 19-0287 (La. 4/29/19), 268 So. 3d 1029.

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. *Id*. When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Lilly, supra*; *State v. Green, supra*.

To convict an accused of molestation of a juvenile, the state must prove beyond a reasonable doubt that the defendant: (1) was over the age of 17 and more than two years older than the victim; (2) committed a lewd or lascivious act upon the person or in the presence of any child under the age of 17; (3) had the specific intent to arouse or gratify the sexual desires of himself or the victim; and (4) committed the act by use of force, duress, psychological intimidation or by the use of influence by virtue of a position of control or supervision over the juvenile. La. R.S. 14:81.2; *State v. Hernandez*, 55,256 (La. App. 2 Cir. 8/9/23), 369 So. 3d 962.

La. R.S. 14:81 defines the crime of indecent behavior with juveniles. It states in part:

> A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:
> (1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons.

11

A lewd or lascivious act, for the purposes of molestation of a juvenile, is one which tends to excite lust and to deprave morals with respect to sexual relations and which is obscene, indecent, and related to sexual impurity or incontinence carried on in a wanton manner. *State v. Redfearn*, 44,709 (La. App. 2 Cir. 9/23/09), 22 So. 3d 1078, *writ denied*, 09-2206 (La. 4/9/10), 31 So. 3d 381.

Eckles argues on appeal that the evidence was insufficient to convict him of either molestation or indecent behavior. More specifically, he contends that Hughes failed to ask about other possible offenders. He further contends that there was no medical or psychiatric evidence regarding S.L's competency despite her medical problems.

The evidence established beyond a reasonable doubt that Eckles was guilty of molestation of a juvenile. The evidence showed that Eckles was over 17 and that S.L. was 15 on the date of the offense. S.L. stated during her Gingerbread House interview that Eckles rubbed his penis in front of her, forced her to touch his penis, touched her breasts after lifting her shirt and removing her bra, and touched her vaginal area. S.L. was under Eckles's control at the time, and clearly these were lewd and lascivious acts. Eckles also clearly had the specific intent to arouse himself or gratify his sexual desires when he took those actions.

The evidence also established beyond a reasonable doubt that Eckles was guilty of indecent behavior with juveniles. Eckles committed a lewd and lascivious act upon her person or in her presence with the intent to arouse or gratify his sexual desires when he told S.L. to search for anime pornography and had her watch it, when he sniffed her vagina after lowering her pants and panties, and when he asked to sniff cocaine off her butt.

12

Trial counsel probed S.L.'s competency while questioning witnesses. During closing arguments, S.L.'s trial counsel told the jury that S.L. had severe mental health issues and developmental deficiencies. Trial counsel also argued to the jury that S.L. was a troubled young lady in a difficult environment, and that troubled young people do not always tell the truth. The jury was able to assess S.L.'s credibility and ability to understand questions from both the Gingerbread House interview and from her testimony in court.

In a footnote in his brief, appeal counsel asserts that this court should consider whether trial counsel provided ineffective assistance of counsel since there was no challenge or objection to S.L.'s competency. We decline to do so as we note that claims of ineffective assistance of counsel are more properly raised in an application for post-conviction relief in the trial court because this provides the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. *State v. Galloway*, 54,704 (La. App. 2 Cir. 2/1/23), 354 So. 3d 919, *writ denied*, 23-00366 (La. 5/31/23), 361 So. 3d 467.

***Excessive sentence***

Eckles next argues that his sentences are excessive because there was no evidence of prior predatory conduct. He also argues that the maximum sentence is excessive in this case.

When a defendant fails to timely file a motion to reconsider sentence, the appellate court's review of the sentence is limited to a bare claim of constitutional excessiveness. *State v. Mims*, 619 So. 2d 1059 (La. 1993); *State v. Benson*, 53,578 (La. App. 2 Cir. 11/10/20), 305 So. 3d 135.

A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a

13

purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bell*, 53,712 (La. App. 2 Cir. 1/13/21), 310 So. 3d 307. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166.

The trial court has wide discretion in the imposition of sentences within the statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *State v. Trotter*, 54,496 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1116. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Bell*, *supra*.

As a general rule, maximum or near-maximum sentences are reserved for the worst offenders and the worst offenses. *State v. Cozzetto*, 07-2031 (La. 2/15/08), 974 So. 2d 665; *State v. Gibson*, 54,400 (La. App. 2 Cir. 5/25/22), 338 So. 3d 1260, *writ denied*, 22-00978 (La. 3/7/23), 356 So. 3d 1053.

If a defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883. Concurrent sentences arising out of a single course of conduct are not mandatory. *State v. Heath*, 53,559 (La. App. 2 Cir. 11/10/20), 304 So. 3d 1105, *writ denied*, 20-01422 (La. 4/7/21), 313 So. 3d 981. Consecutive sentences under those circumstances are not necessarily excessive. *Id*. It is

within the court's discretion to make sentences consecutive rather than concurrent. *Id*. Factors to be considered in imposing consecutive sentences include the gravity and viciousness of the offense, the harm done to the victims, the risk of danger to the public, the offender's criminal history, and his potential for rehabilitation. *Id*. The failure to articulate specific reasons for consecutive sentences does not require remand if the record provides an adequate factual basis to support consecutive sentences. *State v. Sandifer*, 54,103 (La. App. 2 Cir. 12/15/21), 330 So. 3d 1270.

La. R.S. 14:81.2(B)(2) stated at the time of the offenses that whoever commits the crime of molestation of a juvenile, when the victim is thirteen years of age or older but has not yet attained the age of seventeen, and when the offender has control or supervision over the juvenile, shall be fined not more than ten thousand dollars, or imprisoned, with or without hard labor, for not less than five nor more than twenty years, or both. Eckles received a midrange sentence of 10 years at hard labor. In fact, the court exhibited leniency as it originally was going to sentence Eckles to 15 years at hard labor.

La. R.S. 14:81(H)(1) states that whoever commits the crime of indecent behavior with juveniles shall be fined not more than five thousand dollars, or imprisoned with or without hard labor for not more than seven years, or both. The 5-year sentence received by Eckles was below the maximum sentence. Moreover, there was no imposition of a hard labor condition.

Eckles quickly took advantage of his daughter's vulnerabilities shortly after their father-daughter relationship began. The sentences, considered individually or collectively with the consecutive condition imposed, are not

a needless infliction of pain and suffering and do not shock the sense of justice.

***Error patent***

According to the transcript from sentencing, the 5-year sentence for the indecent behavior conviction was imposed without a hard labor condition.  However, the minutes reflect that it was imposed at hard labor.

When there is a discrepancy between the minutes and the transcript, the transcript prevails.  *State v. Lynch*, 441 So. 2d 732 (La. 1983).  Accordingly, we remand this matter to the trial court to correct the minutes to remove the hard labor condition for the 5-year sentence for Eckles's indecent behavior conviction.

## CONCLUSION

For the foregoing reasons, Eckles's convictions and sentences are affirmed.  The matter is remanded to the trial court to correct the minutes to reflect that the 5-year sentence for the indecent behavior with juveniles conviction was imposed without a hard labor condition.

**CONVICTIONS AND SENTENCES AFFIRMED; REMANDED.**